In re Timothy J. BALLARD, Debtor.

Robert JACOBS and Arleen Jacobs, Plaintiffs,

v.

Timothy J. BALLARD, Defendant.

Wayne M. UPRIGHT and Linda M. Upright, Plaintiffs,

v.

Timothy J. BALLARD, Defendant.

Bankruptcy No. 5–80–00095.

Adv. Nos. 205–5–80–0035, 205–5–80–0042.

United States Bankruptcy Court, D. Connecticut.

Feb. 7, 1983.

Joseph Dimyan, Coury & Dimyan, Danbury, Conn., for plaintiffs, Robert and Arleen Jacobs.

Kevin P. Thornton, Sturges & Mathes, Southbury, Conn., for plaintiffs, Wayne and Linda Upright.

Daniel Meister, Norwalk, Conn., for defendant.

## MEMORANDUM AND DECISION

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiffs in both of the above-captioned adversary proceedings, which were tried together, seek exceptions to the debtor's discharge based on various allegations of fraud involving the debtor's home construction business.

### I.

### BACKGROUND

On February 13, 1980, Timothy J. Ballard (debtor) filed a voluntary petition under Chapter 7 of the Bankruptcy Code and scheduled Wayne W. and Linda M. Upright (Uprights) as well as Robert and Arleen Jacobs (Jacobses) as unsecured creditors. The Jacobses seek to except their debt pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(4). The Uprights seek to except their debt pursuant to 11 U.S.C. § 523(a)(2)(A).

After considering the evidence adduced, the credibility of the witnesses and the applicable law, I conclude, for the reasons set forth below, that a debt owed to the Jacobses in the amount of $5,000.00 is nondischargeable and that a debt owed to the Uprights in the amount of $12,500.00 is nondischargeable.

### A.

### Jacobs

During all relevant periods, the debtor was engaged in the general construction business. In the course of that business, the debtor customarily began the construction of a residence on a "speculation" basis and then locate a buyer for the property, after which construction was completed under an agreement between the parties.

During August, 1979, the Jacobses entered into a formal binder agreement to purchase one of the debtor's properties. At that time, the Jacobses paid $1,500 to a real estate broker pursuant to the binder agreement. At a date undetermined by the evidence, the $1,500 was transferred to the debtor by the real estate broker.

During September, 1979, the Jacobses and the debtor formally entered into a contract whereby the Jacobses would purchase a fully completed residence on the property. At that time, the residence was fifty to sixty-five percent completed. The contract provided that the Jacobses make an additional deposit of $13,500.00 upon the signing of the agreement with the balance of $135,000.00 to be paid upon the delivery of the deed to the property. On September 13, 1979, the Jacobses paid the debtor $13,500.00.

Thereafter, the debtor requested the Jacobses to make an advance payment on the basis that he needed additional money to make certain that various work on their home could be started immediately. On September 15, 1979, in reliance upon that representation, the Jacobses paid the debtor an additional $5,000.00 in cash.

It was undisputed that the residence was never completed by the debtor. There was contradictory testimony, however, as to how much work was done after September 15, 1979. Dr. Jacobs testified that virtually no work was done, and in support of that claim, the Jacobses offered two receipts which tend to show that the work promised to be done by the debtor was in fact done by others at the Jacobses request. The debtor, on the other hand, testified that the job was almost completed when he stopped work. Other than his uncorroborated testimony, there was no evidence that there was any significant work under the contract after September 15, 1979. In that regard, the debtor testified that he placed the $13,500.00 deposit into a general account and paid cash to subcontractors. The progress of those funds, however, cannot be traced from the documentary evidence or the debtor's testimony.

### B.

### *Upright*

The fraud claimed by the Uprights also occurred in connection with the debtor's construction business. Like the Jacobses, Linda Upright entered into a contract with the debtor.

On October 12, 1979, at the time of the closing, the debtor presented the Uprights with an "Owners Affidavit" and an "Affidavit As To Mechanics' Liens," both of which were signed and sworn to by the debtor. The first affidavit provided in relevant part:

"This Affidavit is made for the purpose of inducing LINDA M. UPRIGHT and WAYNE N. UPRIGHT to purchase said premises and to induce First American Title Insurance Company to issue its policy or policies of title insurance, among other things insuring against unrecorded or inchoate mechanics liens, well knowing that they will do so only in complete reliance upon the truth and accuracy of the statements contained herein."

Similarly, the second affidavit provided:

"2. That he [the debtor] is this day transferring title to said premises to Wayne N. Upright and Linda M. Upright, both of the Town of New Fairfield.

3. That he [the debtor] certifies that all persons and corporations that have rendered any services or furnished any materials in connection with the construction and erection of the buildings located on the above lot have signed waivers of mechanics' liens and that there are no other suppliers or materials or persons or corporations who have furnished labor on this job who are entitled to any rights or lien whatsoever."

There is no serious dispute that the above representations regarding claims of mechanic lienors were false, that the Uprights relied on the false representations, and that mechanics' liens were placed on the property by Stevenson Lumber Co., Inc. a/k/a Stelco, Inc. (Stelco) securing a debt in excess of $16,000.00 and by Builder's Carpet, Inc. (BCI) securing a debt of $1,500.00. The Uprights settled the Stelco claim for $11,000.00. The BCI claim remains unresolved. The real controversy here centers on the question of the debtor's knowledge of the misrepresentation at the time he presented the false affidavits.

Prior to the alleged fraud, the debtor's financial affairs and records were in disarray. On or about October 1, 1979, the debtor made a check payable to Stelco in the amount of $16,516.47, which, shortly thereafter but prior to the closing, was returned for insufficient funds. Stelco advised the debtor of this fact. Thus, within approximately one week of the closing, the debtor knew of an outstanding obligation to Stelco. He also knew that at that time, he had insufficient funds in his checking account to cover the Stelco debt. The debtor testified, however, that a representative of Stelco, named "Scott," met with him prior to the closing and instructed him to post-date the check and redeposit it, but the testimony of Scott directly contradicted the debtor. The debtor further testified that he expected proceeds from the closing as well as other proceeds to cover the check,

which was allegedly post-dated to October 12, 1979, but he did not recall any funds being placed in the account prior to the closing, and there is no documentary evidence of any such deposit. Moreover, although the debtor was paid by his attorney, who acted as disbursing agent, no money was ever paid to Stelco.

There was little evidence as to the debtor's knowledge of BCI's claim. The debtor merely testified that he did not think BCI had done any work prior to the closing. Mr. Upright, however, testified that a carpet had been installed prior to the closing.

## II.

## DISCUSSION

### A.

### *Jacobs*

I will first consider whether the debt owed to the Jacobses should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(4) which states in pertinent part: "(a) A discharge under section 727 ... does not discharge an individual debtor from any debt—(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny." The Jacobses claim that the debtor, while acting in a fiduciary capacity, fraudulently misapplied the funds he received from them, as noted above. The debtor counters, *inter alia,* that there was no fiduciary relationship within the meaning of section 523(a)(4).

Under Act § 17(a)(4),[1] which was the predecessor of Code § 523(a)(4), the term fiduciary was construed to apply only to express or technical trusts, existing prior to any act of wrongdoing. The section did not encompass trusts which arose out of the misconduct of the bankrupt. *See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153–154, 79 L.Ed. 393 (1934); *In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981); *In re Angelle,* 610 F.2d 1335 (5th Cir.1980). This construction has been applied equally in cases arising under Code § 523(a)(4). *See, e.g., In re Paley,* 8 B.R. 466 (Bkrtcy.E. D.N.Y.1981). In determining whether the requisite trust exists, the court should consult state law, although the issue ultimately remains a federal question. *See In re Angelle, supra; In re Paley, supra.*

In the instant case, the Jacobses offer no documents that show an express trust existed. There is, for instance, no suggestion in the contract between the parties that a trust was thereby created, nor was there an oral promise to hold the funds in trust. Furthermore, the Jacobses do not refer to any Connecticut statute under which the requisite trust might have arisen.

In support of their position that the debtor owed them a fiduciary obligation, however, the Jacobses cite a number of cases involving similar facts.[2] These cases are all readily distinguishable from the instant case because in the cited cases, the courts found that applicable state law had established a trust.[3] As noted, no such

1. Bankruptcy Act of 1898 § 17. Debts Not Affected by a Discharge. a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as (4) were created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity.

2. *In re Edmond,* 5 B.R. 172, 6 B.C.D. 556 (Bkrtcy.W.D.Okl.1980); *In re Romero,* 535 F.2d 618 (10th Cir.1976); *In re Morris Ketchum, Jr. & Associates,* 409 F.Supp. 743 (S.D.N.Y.1975); *In re Angelle,* 425 F.Supp. 823 (W.D.La.1977), rev'd, 610 F.2d 1335 (5th Cir.1980); *Heyerdale v. Haneman,* 170 So.2d 401 (La.App. 4th Cir. 1964), *writ refused,* 247 La. 486, 172 So.2d 293 (1965).

3. In *In re Edmond, supra,* the court referred to an Oklahoma statute which created a trust. Similarly, in *In re Morris Ketchum, Jr. & Associates, supra,* the court took account of state law which provided in part that funds "received by a contractor under a contract for an improvement of real property ... constitutes assets of a trust" *Id.* at 745, *quoting,* New York Lien Law § 70(1) (Mckinney 1966).

In *In re Romero, supra,* the court concluded that there was a fiduciary relationship because the contractor's "obligation not to divert funds is imposed by statute." *Id.* at 622. It should be noted that *Romero* has been criticized for relying on a statute "which operates only after an act of wrongdoing has occurred." *In re Pedrazzini, supra,* at 759; *In re Angelle, supra,* at 1340.

state law applies here. The Connecticut cases relied on by the Jacobses are cited merely for the proposition that a constructive trust will be imposed after a wrongdoing under certain circumstances.[4] Constructive trusts, however, fall outside the scope of 11 U.S.C. § 523(a)(4). *See, e.g., In re Paley, supra.*

■ In sum, there is nothing on the record which demonstrates that an express or technical trust existed. I therefore conclude that the debtor was not a fiduciary within the meaning of Code § 523(a)(4)[5] and turn to the question of whether the debtor was guilty of fraudulent misrepresentation under Code section 523(a)(2)(A), as claimed by the Jacobses.

Code § 523(a)(2)(A) states in pertinent part: "(a) A discharge under section 727 . . . does not discharge an individual debtor from any debt (2) for obtaining money . . . by (A) false pretenses, a false representation, or actual fraud . . ." The Jacobses claim that they gave the debtor $20,000.00 in reliance on his fraudulent misrepresentation that he would apply the funds to the improvement of the subject property.

■ Under Code § 523(a)(2)(A), the elements of nondischargeability for fraudulent misrepresentation are as follows:

(1) the debtor made the representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on such representations;

(5) that the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Fosco,* 14 B.R. 918, 920 (Bkrtcy.D. Conn.1981), *citing inter alia, In re Hout-*

*man,* 568 F.2d 651, 655 (9th Cir.1978). The burden of proving each of these elements falls upon the objecting creditor. *See Household Finance Corp. v. Danns,* 558 F.2d 114, 116 (2d Cir.1977). After considering all the evidence and the credibility of the witnesses, I conclude that the Jacobses have met this burden only with respect to the $5,000.00 payment on September 15, 1979.

■ The initial $1,500.00 binder and the subsequent $13,500.00 payment were contractual obligations rather than payments made in reliance upon the debtor's representation. There is no claim made here that the contract itself was a part of a fraudulent scheme. Thus, the Jacobses' claims in that regard must fail. The remaining $5,000.00 payment was, however, induced by the debtor's fraudulent misrepresentation. Here, it is apparent that the Jacobses made that payment because the debtor persuaded them that he needed the additional funds immediately for the completion of the payment for certain work on their house. Relying upon that representation, the Jacobses paid the additional funds but the debtor did not keep his promise to do the work. While a broken promise alone is not tantamount to a false representation under section 523(a)(2)(A), here I find that the promise was made without any present intent to perform. The debtor did almost no additional work, nor did he credibly explain what he did with the majority of the funds.

### B.

#### *Upright*

As to the Uprights' claim under Code § 523(a)(2)(A), the debtor conceded that he made materially false statements, that the Uprights relied upon these statements and that they consequently suffered monetary

---

In re Angelle, 425 F.Supp. 823, *supra* and *Heyerdale v. Hanemen, supra* are not only factually distinguishable but also must be deemed of little precedential value in light of the Fifth Circuit's reversal of the district court's decision in *Angelle. See In re Angelle, supra.*

**4.** *Worobey v. Sibieth,* 136 Conn. 352, 71 A.2d 80 (1949); *Reynolds v. Reynolds,* 121 Conn.

153, 183 A. 394 (1936); *Millard v. Green,* 94 Conn. 597, 110 A. 177 (1920); *Verzier v. Convard,* 75 Conn. 1, 52 A. 255 (1902); *Massari v. Esposito,* 7 Conn.Supp. 183 (Conn.Sup.Ct. 1939).

**5.** *See In re Baiata,* 12 B.R. 813 (Bkrtcy.E.D.N.Y. 1981); *In re Boese,* 8 B.R. 660 (Bkrtcy.D.S.D. 1981).

loss. The debtor based his defense on his claim that he did not know that the affidavits he furnished at the closing were false. In further support of his position, the debtor argued that even if evidence showed that he acted in reckless disregard of the truth of the affidavits, this conduct would not satisfy the scienter requirement under Code section 523(a)(2)(A) and fraudulent intent should not be inferred therefrom.

■ Under nonbankruptcy law, it is well established that the scienter element in an action alleging deceit may be satisfied by a reckless disregard for the truth of the matter represented. As stated by then Chief District Judge Clarie:

"A widely accepted rule of fraudulent intent, applicable here, is that civil liability may be imposed where it is proved that a defendant's statements were made recklessly or carelessly, without knowledge of their truth or falsity, or without reasonable grounds for belief in their truth, especially in a case where (1) the defendant was under a duty to have the knowledge in question, (2) a relation of trust or expert reliance existed, (3) a statement was made to induce a business arrangement, or (4) the knowledge or information in question was within the special province of the defendant."

. . . . .

*Jones v. Fenton Ford, Inc.,* 427 F.Supp. 1328, 1334 (D.Conn.1977) (citations omitted); *see also Sallies v. Johnson,* 85 Conn. 77, 82, 81 A. 974, 976 (1911) ("A fraudulent representation in law is one that is either knowingly untrue, or made without belief in its truth, or recklessly made and for the purpose of inducing action upon it"). The fraud lies in the fact that a party affirms something to be true for which he has no basis for belief.

"Whether the party thus misrepresenting a fact, knew it to be false, or made the assertion without knowing whether it were true or false, is wholly immaterial; for the affirmation of what one does not know or believe to be true, is equally in morals and law, as unjustifiable as the affirmation of what is known to be positively false."

*Smith v. Richards,* 38 U.S. 26, 36, 10 L.Ed. 42 (1839) (citation omitted).

Turning to bankruptcy law, it should first be noted that the relevant cases arising under Act § 17a(2), the predecessor of Code § 523(a)(2), hold that a reckless disregard for the truth satisfied the scienter requirement. *See Carini v. Matera,* 592 F.2d 378, 380 (7th Cir.1979); *In re Houtman,* 568 F.2d 651 (9th Cir.1978); *see also In re Weinroth,* 439 F.2d 787, 788 (3rd Cir.1971) (recognizing that reckless indifference to the truth is sufficient to *deny* discharge under Act § 14a(3)).

Current Code § 523(a)(2)(A) does not mandate a different result. The introduction of the phrase "actual fraud" into that section, emphasized by the debtor, merely codifies the law as it was under the prior Bankruptcy Act.[6] Since "actual fraud" reflects prior law which encompassed reckless representations, the debtor's reliance on the phrase "actual fraud" in Code section 523(a)(2)(A) is misplaced.

■ Here, the evidence suggests that the debtor knew that Stelco's claim was outstanding at the time he presented the affidavits at the closing as it does not appear that he had any basis for believing that he had sufficient funds to pay Stelco prior to the closing. At the very least, the debtor acted with reckless disregard of the truth of the statements contained in the affidavits. Furthermore, the claim that he intended to satisfy Stelco's check with proceeds from the closing merely underscores his knowledge, that at the time of the closing, Stelco had not been paid. The essence of the fraud remains unchanged: he knew the affidavits were false or swore to them with reckless disregard of the truth of the statements made therein; he intended to induce the Uprights' action with the affidavits; the Uprights relied on the affidavits; and the Uprights consequently suffered damages.

**6.** 124 Cong.Rec. H 11,096 (Sept. 28, 1978); S 17,413 (Oct. 6, 1978).

Finally, I am also persuaded that the debtor made false representations regarding the status of BCI. His uncorroborated claim that he did not think BCI had done any work is incredible, especially in light of the testimony to the contrary, as noted above.

### III.

In view of the foregoing, judgment should be, and hereby is, entered in favor of the plaintiffs, the Jacobses, that the debt owed to them by the debtor in the amount of $5,000.00 is nondischargeable, and in favor of the plaintiffs, the Uprights, that the debt owed to them by the debtor in the amount of $12,500.00 is nondischargeable.