**In re Louis S. IONNA, III and Deborah K. Ionna, Debtors.**

**Timothy J. SOUKUP, Plaintiff,**

**v.**

**Louis S. IONNA, III, Defendant.**

Bankruptcy No. 1–85–03952.
Adv. No. 1–86–0081.

United States Bankruptcy Court,
S.D. Ohio, W.D.

May 15, 1987.

Jeffrey Bakst, Cincinnati, Ohio, for plaintiff.

Robert A. Goering, Cincinnati, Ohio, for defendant.

## DECISION

BURTON PERLMAN, Bankruptcy Judge.

The complaint in this adversary proceeding asserts a claim against defendant/debtor for damages, and seeks a holding by this court that the debt be found to be nondischargeable. In addition, the complaint seeks to have debtor's discharge denied. There are other claims set out in the complaint, but these were abandoned during closing argument.

Plaintiff is an individual who entered into a contract with defendant pursuant to which defendant was to design and build a home for plaintiff. (Documents were signed by defendant as president of Design Network Corporation. There is nothing in the record to establish that the latter is indeed a corporation rather than a trade name. We assume that defendant at all times was acting as a sole proprietor.) The events with which we are here concerned occurred between about late March, 1984 and January, 1985. Plaintiff had decided he wanted what he characterized as a "high energy" home. In about late March or early April, 1984, he selected defendant from the Yellow Pages. After discussions with defendant and people on his staff, plaintiff entered into a "Design and Drafting Services Contract" on May 5, 1984. This agreement includes the clause: "Structure to be Designed to Fit Budget of $80,000.00 to $90,000.00 (Structure)." The contract included as well the following: "Specific price for construction to be agreed upon after preliminaries." On May

8, 1984, plaintiff and defendant signed a document entitled "Construction Contract". This contract as well included a clause to the effect that a specific price for construction would be determined after preliminary drawings were complete. The document also contains a recitation that plaintiff was to pay $4,500.00 down with the balance of $4,000.00 upon obtaining a financing commitment. Plaintiff gave defendant a check in the amount of $4,500.00 dated May 8, 1984 and a second check in the amount of $4,000.00 dated May 16, 1984.

A construction loan for plaintiff was obtained from Spring Garden Savings and Loan Company. The closing statement for the loan is dated July 24, 1984. The loan obtained was in the amount of $96,000.00. (PX 14). On the same date, there was a closing at Spring Garden Savings and Loan on plaintiff's acquisition of the land upon which the home was to be built. Plaintiff's total expense in this acquisition was $30,480.00, of which he paid $5,000.00 in cash. The balance, $24,423.60, was taken from the construction loan.

Also on the same day, July 24, 1984, plaintiff and defendant entered into a second construction contract. This contract says that it is based on costs, plus 15% commission, for defendant. The schedule for payment is 10% on signing; payment when footings and foundation complete; payment when rough framing complete; payment when mechanicals roughed in and insulation installed and drywall hung; and balance when project complete.

Plaintiff here proceeds on two grounds. First, he contends that the debt owed him by defendant should be held nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) because there was actual fraud in the incurring of the indebtedness. The second ground is a claim that defendant should be denied a discharge altogether on grounds that defendant's conduct has, pursuant to 11 U.S.C. § 727(a)(3) and (4), been such that he should be denied a discharge.

1. Dischargeability. In order to establish this cause of action, plaintiff must show that defendant made a materially false statement; that at the time he made it, defendant knew the statement was false; that the statement was made with the intention of deceiving plaintiff; that plaintiff relied on the misrepresentation; and plaintiff suffered damage. *In re Hospelhorn,* 18 B.R. 395, 397 (Bankr.S.D.Ohio W.D. 1981); *In re Borah,* 36 B.R. 535 (Bankr.M. D.Fla.1983); *In re Kyriazes,* 38 B.R. 353 (Bankr.N.D.Ill.1983); *In re McCourt,* 20 B.R. 388 (Bankr.Mass.1982); *In re Landon,* 37 B.R. 568 (Bankr.N.D.Ohio 1984); *In re Samford,* 39 B.R. 423 (Bankr.M.D. Tenn.1984). Furthermore, because the claim sounds in fraud, plaintiff must carry his burden of proof by clear and convincing evidence. *In re Martin,* 761 F.2d 1163 (6th Cir.1985).

In this case, identification of the claimed misrepresentation requires more discussion than is usual. This is so in part because there are written agreements between the parties. The first agreement between the parties was a Design and Drafting Services Contract. That agreement, executed by both parties, specified that the structure was to be designed to fit a budget of $80,000.00 to $90,000.00. This, however, is not the representation upon which plaintiff relies. Subsequent to the Design Contract, on May 8, 1984, the parties entered into a Construction Contract. That contract in form was a fixed-price contract, but it included no price. It did, however, specify that plaintiff was to pay defendant $8,500.00, which plaintiff did. Plaintiff testified that the $8,500.00 was intended to be a 10% down payment, based on the mean average estimated cost, referring to the $80,000.00 to $90,000.00 range specified in the Design Contract. Yet, ultimately, this is not the basis for the offending representation claim by plaintiff.

Instead that occurred on the date that the construction loan at Spring Garden Savings and Loan was closed, July 24, 1984. Following the closing, the parties went to defendant's office, at which time a cost-plus contract was signed by the parties. The representation upon which plaintiff relies emerges from the following testimony by plaintiff:

Answer: OK, well, basically, Lou explained to me that he builds custom homes and that the reason why there wasn't a specific price involved was that this house was unique. He builds custom homes and not a cookie-cutter type of house that Ryland or Drees may make, and that each one is very unique and since they're not built over and over and over again, that there would be some price variation because this is the first, a prototype, a one of a kind, and he didn't know what kind of things he'd encounter so he needed to sign the construction contract which would make some allowance to a varied price, but not to go beyond the $96,000.00 we were—we had just acquired from the bank.

Plaintiff's position is then that defendant represented that the cost of the house that he would build for plaintiff would not exceed $96,000.00. This is the representation in question here. That it was made was corroborated by plaintiff's father, who testified at the trial, and not really denied by defendant. Further, the evidence established that the cost of construction was material to plaintiff.

A separate and independent question which must be dealt with here is whether this representation was false. Again, the situation here is not typical, for in the usual case it is clear whether or not the representation was false. In this case, however, the final cost of construction is not known because the structure has not been completed. We conclude from the record that there has been put into the project work and materials to a value of $102,500.00. The construction lender has paid out some $63,000.00. Plaintiff has, apart from money paid by the building and loan, paid defendant $15,500.00. In addition, approximately $24,000.00 is owed to subcontractors and materialmen for work which they have performed. This leads to the mentioned total.

Defendant, however, asserts that the excess cost above the original projection was caused by extras which are outside the original projection, either because they were costs which were not and could not be anticipated, or because they are costs added to the project by plaintiff himself. We must, therefore, pay attention to the question of extras, which is hotly contested, in order to decide the question of whether there was indeed a misrepresentation. The story about extras, however, is far from clear.

Plaintiff did testify that he recognized that he wished to add certain items which were clearly extras and should be above the cost originally stated. He felt that the total for these was some $3,000.00 to $4,000.00. One of his expert witnesses testified that he would value them at $6,000.00. There is the further complication that the record is not clear as to which of the extras are in fact in the existing structure and which are not. When litigation commenced, defendant prepared a list of extras totaling added cost of $22,362.18, and the parties utilized this in the presentation of the question at the trial. Plaintiff contested the legitimacy of some of the items listed. We have evaluated the evidence and make the following findings:

a) The evidence established that the alarm system desired by plaintiff, cost $2,295.00, is not in the structure, though the wiring for it is.

b) Defendant contended that drywall in the garage, an $800.00 item, was an extra, but the evidence established that it was not. Contrary to the assertion of defendant, we hold that drywalling of the garage, an $800.00 item, is not an extra.

c) There was unusual expense in connection with the foundation which was built, consisting of piering, and placement of a very large quantity of gravel. The cost of this is in the vicinity of some $5,000.00. Plaintiff insists that this may not be regarded as an extra because the expense was incurred because the placement of the house on the lot was changed and this was done without his consent. Defendant disputes this, saying that it was requested by plaintiff. A third version is that the placement of the house was changed because building inspectors required it. We can see no reason why defendant would have moved the placement

of the house for some purpose of his own. It only makes sense that it was moved either at the request of plaintiff or because required by building inspectors because soil conditions did not permit building on the original site. This item is not really in the "extra" category, but rather is an unexpected cost. Plaintiff believes that defendant is obliged to absorb this cost. We cannot agree with this position. This item is chargeable to plaintiff. He signed a cost-plus contract. While it was represented to him that the price of the building would not exceed $96,000.00, he is chargeable with understanding that if there were unexpected cost items, this would be his responsibility. Indeed, he admitted that he was expressly so informed at the time he signed the construction contract.

■ d) Much was said at the trial about two fireplaces in the house, the extra list showing $3,500.00 on account of fireplace. Plaintiff testified that from the very beginning it was understood that there would be one in the great room and one in the master bedroom. Defendant contests this position, asserting that it was always understood that the fireplace in the bedroom was optional. This record makes it perfectly clear that on this score plaintiff is correct. There were always supposed to be two fireplaces in the house. We will not recognize this item as an extra. We comment, however, that the evidence indicated that the fireplace finally provided for in consultation with plaintiff was a very unusual one, and extra costs in its design and construction may well have been incurred. Defendant, however, did not establish this point, but stood on the untenable position that the second fireplace was optional, a position we must reject.

From the foregoing consideration, we conclude that defendant's $22,362.18 list of extras must be reduced by $6,595.00, leaving $15,767.00 which should be applied against the $102,500.00 costs actually incurred. This leaves a net of $86,733.00.

■ The evidence indicates that construction was only completed to the drywall stage, substantially short of completion. The record contains no authoritative basis for estimating the final cost, but we estimate actual cost based on the following. The schedule appearing in the first construction contract entered into between the parties indicates that the completion of drywall marks a stage approximately 75% through construction. Furthermore, one of the contractors called by plaintiff testified that it is customary that when four draws are provided for, each is for 25% of the total. Here, the construction contract provided for four draws, and work was completed through the drywall stage. Defendant himself testified that the job was only done through the drywall stage. Based upon costs actually incurred excluding extras, of $86,733.00 through the drywall stage, we estimate a final cost of $115,644.00. This means that the projected final cost very substantially exceeds the amount which defendant told plaintiff would be the cost of the house. There was, then, a misrepresentation when defendant represented that the cost of the house would not exceed $96,000.00.

■ The second element of the fraud claim which plaintiff must prove is that at the time the misrepresentation was made, defendant knew it to be false. Here, plaintiff contends that defendant knew that he could not build the house for plaintiff that he contracted to build for a price not to exceed $96,000.00 at the time that the representation was made, July 24, 1984, prior to the time that any construction was begun. To make out this element, plaintiff offered two kinds of evidence. First, there was the testimony of three individuals in the construction business that, based upon the plans and what they had seen at the site, the home in question would cost in the vicinity of $140,000.00 to $150,000.00. We have serious problems with this evidence because the figure we reached, which was largely based on actuality rather than entirely upon estimation, was considerably less, $25,000.00 to $35,000.00 less, than such opinions. We will not accept such testimony as evidence to show that defendant knew that his representation was false at the time that it was made.

Secondly, plaintiff called as witnesses 14 individuals who had contracted with defendant for the construction of homes, each of whom had had the experience of having final costs far exceed the original price of which they were advised by defendant. We must balance against this evidence the fact that defendant has built some 150 homes. While we certainly would not encourage plaintiff to call as witnesses all of the homeowners who have dealt with defendant, we cannot accept this evidence as proof of the element under discussion. There is nothing in the record to show that the experience of these witnesses represented a usual practice on the part of defendant, rather than an expected number of incidents for one who is in the somewhat unpredictable business of building custom homes.

In home construction cases, nondischargeability on grounds of fraud has been found in cases where builders/debtors used money from draws on one job to pay materialmen on other jobs, *In re Miller*, 5 B.R. 424 (Bankr.W.D.La.1980), or where there was no performance at all and an intent not to perform from the beginning was found, as in *In re Ballard*, 26 B.R. 981 (Bankr. Conn.1983); *In re Fenninger*, 49 B.R. 307 (Bankr.E.D.Pa.1985). It has not been found in cases where all that has been proved is a failure to fulfill a promise, without proof of an intent to break the promise at the time that it was made. *In re Sorrell*, 4 BCD 1255 (Bankr.Va.1979). See also, *In re Ciarleglia*, 50 B.R. 455 (Bankr.M.D.Fla.1985). We find the present case to be in the latter category.

Having found the second element of plaintiff's fraud claim not proved, it is not necessary for us to consider the third and fourth elements, intent to deceive, and damages.

Plaintiff has also prayed that defendant be denied a discharge pursuant to 11 U.S.C. § 727(a)(3) and (4)(A) and (B) which reads:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

\* \* \* \* \* \*

As evidence that defendant has failed to keep or preserve records of business transactions, plaintiff presented defendant's 1983 and 1984 federal tax returns (PX 21, 22). Plaintiff's counsel asked defendant on cross-examination whether he had any records to show how he calculated the gross income on his tax returns, to which defendant responded that he had provided plaintiff's counsel with such records, specifically the Provident Bank statements. (Defendant had previously testified that all receipts from construction were deposited in the Provident Bank accounts.) Defendant further testified that gross income on the tax returns was calculated by adding all deposits and deducting legitimate business expenses.

As evidence of a false oath or fraudulent claim, plaintiff relies on defendant's statement made at a deposition taken on March 27, 1987 that all of the money from construction was deposited into the Provident Bank accounts. At the trial, however, defendant testified that a check for $7,000.00 written by plaintiff to defendant (PX 24) had been deposited in a Home State Savings Bank. Defendant explained the inconsistency by testifying that the $7,000.00 check deposited in Home State was deposited to his mother's account. He stated he had borrowed this amount of money from his mother to pay for items on the plaintiff's house and had promised to reimburse her when plaintiff paid him, which he did. Although plaintiff further tried to prove the falsity of the deposition statement with a second check for $5,700.00 (PX 27), dated July __, 1983, defendant was able to iden-

tify from the Provident Bank records a possible corresponding deposit on July 15, 1983, of $7,109.00 which defendant assumes could have included the deposit of the $5,700.00 check.

From the above evidence, plaintiff would like us to conclude that defendant should be denied a discharge because "the evidence has shown, by clear and convincing evidence, that [defendant] has not included all his income in his gross income for tax purposes, and has failed further to maintain any records whatsoever in which to reconstruct his gross income." (Plaintiff's trial brief, p. 11.) Also, although not articulated in plaintiff's trial brief, presumably plaintiff would like a finding that the statement made at the March 27, 1987 deposition was a "false oath".

■ As stated in an opinion by Judge Newsome of this court, "Under § 727(a)(3), the issue of failure of recordkeeping is one of a degree of seriousness." The party contesting the discharge has the burden of proof. *In re Bess, Adv. No. 1–83–0611* (Bankr.S.D.Ohio 1984). Debtor adequately explained how he calculated his gross income. There is no testimony or evidence to suggest that the income was not calculated as defendant explained. Defendant also stated that he turned over all the records evidencing gross income to plaintiff and this was also uncontroverted. There is no testimony that defendant had records which he destroyed or concealed, nor any evidence that his recordkeeping was inappropriate for this type of business. Indeed, he filed tax returns and kept bank statements.

■ As to the false oath argument, the plaintiff has failed to prove that the defendant knowingly and fraudulently made a false oath. That one check was deposited into a Home State savings account, in spite of defendant's prior testimony at a deposition that all deposits were made to Provident Bank, was credibly explained by the defendant and not further controverted by plaintiff.

The foregoing constitutes our findings of fact and conclusions of law.

The complaint will be dismissed.