In re Emil J. **WHITFORD** and Priscilla R. Whitford, d/b/a Omega Company, Debtors.

Thelma E. **FUGERE** and Harvey T. Fugere, Plaintiffs,

v.

Emil J. **WHITFORD** and Priscilla R. Whitford, d/b/a Omega Company, Defendants.

Bankruptcy No. 8800183.
Adv. No. 880014.

United States Bankruptcy Court, D. Rhode Island.

Jan. 17, 1989.

Patrick L. McKinney, Wakefield, R.I., for debtors.

Thomas J. Grady, Lenihan, Moone, Gallogly & Comolli, Westerly, R.I., for Thelma E. and Harvey T. Fugere.

DECISION

ARTHUR N. VOTOLATO, Jr.,
Bankruptcy Judge.

Heard on September 20 and October 13, 1988, on the complaint of Thelma and Harvey Fugere to declare nondischargeable, pursuant to 11 U.S.C. § 523(a)(2)(A), a debt of the defendants, Emil and Priscilla Whitford.[1] We note initially that the pleadings filed in this adversary proceeding are very confusing. The Complaint and Answer address the issue of the dischargeability of a state court punitive damage judgment, whereas the Joint Pretrial Order and the evidence presented at trial dealt with a claim for recovery of a deposit paid to the debtors, which the plaintiffs allege was procured by fraud. We will decide this matter based on the statements contained in the Joint Pretrial Order, and the evidence introduced, and, in accordance with Fed.R.Civ.P. 15(b), order that the pleadings be amended to conform to the evidence. In addition, because the plaintiffs failed to present evidence relative to punitive damages, that part of their claim is deemed waived.

The dispute herein arises out of a contract entered into on June 26, 1986, between the plaintiffs and defendant/debtor Emil Whitford, in which Whitford agreed to construct a garage and deck on the Fugere's property, and to replace a patio door,[2] all for the price of $12,306. On this same date, at the defendant's request, Mrs. Fugere gave Mr. Whitford a check for $9,570, which Whitford described as the initial deposit for the job. The primary issue for determination is whether, at the time the deposit was given, Mr. Whitford represented to Mrs. Fugere that this sum (which was 77% of the total contract price) was to be used for the purchase of the building materials needed for the job, and whether, when Whitford took the deposit money, he actually intended to use it for that purpose. Mrs. Fugere stated that the defendant told her he needed two-thirds of the contract price as an initial deposit in order to purchase the materials, and that the entire job would then only take two or three weeks to complete. She also stated that she gave him such a large deposit only because of this representation, which she relied on. Although defendants' Exhibit B, the signed contract, includes an initial deposit provision which provides: "Materials $7,855.64 + tax $471.33, Labor $3,979.95, Initial deposit $9570," Mrs. Fugere testified, and her husband similarly attested that they did not remember the deposit provision being filled in when they signed the contract. Whitford initially mailed the contract to the Fugeres, who both signed it prior to the defendant signing, with the space indicating the deposit amount being blank. When Mr. Whitford came to the Fugeres' house to pick up the deposit check, he also took back the contract and promised to mail the Fugeres a copy, which he never did. The Fugeres both testified that they did not see this document again until just before the trial, and at that time first saw the deposit breakdown filled in. The defendant disputes this assertion, and argues that the breakdown provision had to have been on the contract originally in order to enable him to arrive at the initial deposit amount.

The defendant did not contact the Fugeres again until October, 1986, some four months after the signing of the contract and the taking of their deposit money. At that time, Whitford went to the Fugeres' home, did not bring any materials for the construction of the garage nor give an explanation for his delay, but simply started to install the patio doors. After this brief visit, Whitford never returned to the Fugeres' house, even though he hadn't even finished the patio door job, which still required putting in insulation and drywall. During this unexplained period of inaction, Mr. Fugere called the defendant on numer-

---

1. There is no evidence that Mrs. Whitford was in any way involved in the contract negotiations with the Fugeres, and in fact she was not a party to the contract, therefore she is removed as a defendant in this action.

2. This opinion constitutes our findings of fact and conclusions of law. See Bankruptcy Rule 7052 and Fed.R.Civ.P. 52.

ous occasions but always got his answering machine and never received a return call. On December 26, 1986, Whitford sent the Fugeres a letter "to forestall any concern you may have about the delay in construction of your garage." (Defendants' Exhibit C.) Whitford said that his inability to get an excavator on the site was caused by the fact that they were all busy on other jobs. The defendant testified that he initially contacted Howard Richmond, who he had previously used often, to do the excavation work, but was informed that Richmond was busy on a big condominium job in Narragansett which was going to take a while. This testimony was contradicted by Mr. Richmond who stated that he had done only one previous excavation job for the defendant, for which he received only half payment. Richmond, who was credible in our view, explained that Mr. Whitford did call him once, asking for an estimate for the Fugere project. However, Whitford never called him back to do the job. Richmond volunteered that he would have refused anyway, since he didn't receive full payment on the previous job.

Whitford also asserts that he started calling around to other excavators, but was unable to get anyone to do the Fugere job. Consequently, he put the project on hold until he could get an excavator, but stated that he always believed he would complete the job. In the meantime, the deposit money given by the Fugeres was deposited in Mr. Whitford's business account and was being drawn on, over time, to satisfy Whitford's ongoing cash flow problems. The use of this money for purposes unrelated to the Fugeres' project was never authorized by, or even made known to, the Fugeres. The only money of the Fugeres which was used for their job was for the materials purchased to do the patio door, which amount has not been made known to the Court. We are asked by the defendant to believe that for an entire year he could not get an excavator to do the job, and by then the deposit money was all used up and the business fell apart.

The debtor's explanations for his failure to timely order the materials for the job and his inability to complete the job are not credible, particularly in light of the contradictory testimony of Mr. and Mrs. Fugere and Mr. Richmond, all of whom we find are credible witnesses. If the defendant's version were to be believed, he should have purchased the necessary materials [3] while waiting for the excavator, in addition to keeping the Fugeres informed as to the problem he was supposedly encountering. The following actions by Whitford: requiring a 77% deposit, drawing on these funds for other purposes, the conflicting testimony regarding the insertion of the deposit provision in the contract, falsely representing that he needed the deposit to purchase materials, unreasonably delaying commencement of the project, all together reflect a clear intention to defraud the Fugeres when they signed the construction contract and gave the deposit. Furthermore, in support of our conclusions, the schedules filed by Whitford in his bankruptcy case indicate that he was financially in trouble from 1985 onward. Whitford's representation, at the time of accepting the deposit, that he intended to use this money to purchase materials for the Fugere job constitutes a material representation, on which the Fugeres reasonably relied when they gave defendant their check for $9,570.

Mr. Beaumier, a job superintendent and estimator for C & L Builders, Inc. (a Rhode Island remodeling specialist company), testified as an expert witness for the plaintiffs. He also prepared a report of the cost of materials required for this job, based on Whitford's own specifications. (Plaintiffs' Exhibit No. 4.) Although this report had to be adjusted at trial for items not included (Beaumier originally estimated only for items I and II on Whitford's specs, not item III, see Plaintiffs' Exhibit No. 3), his final

---

3. We reject the defendant's contention that the reason he didn't purchase the materials was because they would have to be stored outside, since these materials were for the construction of a garage, which is always exposed to the elements.

figure for the cost of materials to do the entire job was:

$4,383.87  (Items I and II)
  257.00  (Item III)
  395.00  (Additional costs including gravel & electrical materials)
_____
$5,035.87  Total materials

Based on the entire record, we are satisfied that the specific[4] deposit money taken by Whitford ($9,570) was not intended by him to be used for the purchase of materials on the Fugere job.

Under 11 U.S.C. § 523(a)(2),[5] a debt may be determined nondischargeable based on fraud where the creditor proves that:

(1) the debtor made the representations;

(2) at the time he knew they were false;

(3) he made them with the intention and purpose of deceiving the creditor;

(4) the creditor relied on such representations;

(5) the creditor sustained the alleged loss and damage as the proximate result of the representation having been made.

Seiders v. Fenninger (In re Fenninger), 49 B.R. 307, 309 (Bankr.E.D.Pa.1985) (other citations omitted).

The burden of proof of a fraudulent misrepresentation is on the party objecting to the discharge. In re Fenninger, supra; Mick v. Hosking (In re Hosking), 19 B.R. 891, 895 (Bankr.W.D.Wis.1982). A "totality of the circumstances" approach is used to determine whether the debtor intended to defraud the creditors at the time he made the false representation. In re Hosking, supra, at 895; In re Fenninger, supra, at 310. "The existence of fraud may be inferred if the totality of the circumstances present a picture of deceptive conduct by the debtor which indicates that he intended to deceive and cheat the creditor." In re Fenninger, supra (citing Century Bank of Pinellas County v. Clark (In re Clark), 1 B.R. 614, 617 (Bankr.M.D.Fla. 1979)). As previously found, the evidence establishes that Whitford took the Fugeres' deposit money with the intention of using it for purposes other than as represented. The Fugeres reasonably relied on this material misrepresentation and therefore are entitled, under § 523(a)(2), to the amount of their deposit, less the value of the work performed on the patio door, which amounts to $8,570, plus interest.[6]

Enter Judgment accordingly.

_____

4. It is much more likely that Whitford's real intention was to get his hands on the plaintiffs' money to pay other more pressing bills, and later on to repeat the same process in order to catch up on the Fugere job. In the instant game of financial musical chairs, when the music stopped (bankruptcy), the plaintiffs were left with no funds, and the defendant with no customers from whom he could extract cash to do the Fugere job.

5. 11 U.S.C. § 523(a) provides in relevant part:
§ 523. Exceptions to discharge
  a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
  ....

  (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
  (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
  (B) use of a statement in writing—
  (i) that is materially false;
  (ii) respecting the debtor's or an insider's financial condition;
  (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
  (iv) that the debtor caused to be made or published with intent to deceive;

6. Beaumier testified that the value of the labor and materials used in replacing the patio door was $1,000.