In re Vincent A. ROBERTI, Debtor.

**FEDERAL DEPOSIT INSURANCE CORPORATION, Plaintiff,**

v.

**Vincent A. ROBERTI, Defendant.**

**Bankruptcy No. 93–52894.**
**Adv. No. 93–5282.**

United States Bankruptcy Court, D. Connecticut.

Oct. 10, 1996.

Leeland J. Cole–Chu, Cole–Chu and Cipparone, New London, Connecticut, for Plaintiff.

Kevin L. Burns, Owens, Schine, and Nicola, Trumbull, Connecticut, Craig Taschner, Rome, McGuigan, Sabonosh and Klebanoff, P.C., Hartford, Connecticut, for Defendant.

### MEMORANDUM AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT

ALAN H.W. SHIFF, Chief Judge.

The plaintiff seeks a determination that the default judgment entered by the Connecticut Superior Court in its favor collaterally estops the defendant from raising the same issues decided by that judgment in this court. As such, the plaintiff contends that the debt corresponding to that judgment is

excepted from discharge under §§ 523(a)(2)(A), 523(a)(2)(B), and 523(a)(4). In the alternative, the plaintiff contends that on the merits, the debt is not dischargeable under those code provisions.

## BACKGROUND

The applicability of the doctrine of collateral estoppel was previously considered by this court on the plaintiff's motion and the defendant's cross-motion for summary judgment. *See Resolution Trust Corporation* [1] *v. Roberti (In re Roberti)*, 183 B.R. 991 (Bankr. D.Conn.1995) ("*Roberti I*"). In denying the plaintiff's motion for summary judgment, it was determined that while abode service was adequate, collateral estoppel could not be applied to prevent the relitigation of the issues raised in this dischargeability proceeding because the state court "did not determine whether the [defendant] had actual knowledge of the pendency of the state court action and therefore a full and fair opportunity to litigate." *Roberti I, supra* at 1003. The cross-motion was also denied because there were disputed material issues of fact.

The plaintiff again seeks summary judgment on the basis of collateral estoppel and the defendant reasserts his claim that he was not afforded a full and fair opportunity to litigate the issues in state court. For the reasons that follow, the defendant is collaterally estopped from relitigating the issues of whether he engaged in fraudulent conduct and committed larceny.

## I

### COLLATERAL ESTOPPEL

#### *Procedural History*

By summons and complaint dated August 29, 1991, Coastal Savings Bank, FSB ("Coastal Savings") commenced an action against the defendant in Superior Court for the Judicial District of New London to recover damages for alleged breach of contract, unjust enrichment, fraud, forgery, and theft in connection with an unsecured line of credit it had extended to a nonexistent corporate borrower ("New London Action"). *See Pl. Exh. K.* As a result of the defendant's failure to appear, Coastal Savings moved for and was granted a default judgment on November 5, 1991, and awarded damages in the amount of $817,156.16 plus costs on December 4, 1991. The damage award included punitive damages for fraud, statutory treble damages for theft, and double damages for forgery under *Conn.Gen.Stat.Ann.* §§ 52–564 and 52–565 (West 1995). By motion dated September 18, 1992, the defendant moved to open and vacate the default judgment, claiming that he did not receive the summons and complaint, he had no notice of the action, and therefore the court lacked jurisdiction. *Motion to Open and Vacate Judgment, Pl.Exh. R.* [2] The New London court concluded that abode service was proper and denied the motion on January 4, 1993. *See Memorandum of Decision re: Defendant's Motion to Open and Vacate Judgment, Pl.Exh. T.*

On July 23, 1993, counsel for the defendant filed a complaint in the Superior Court for the Judicial District of Fairfield at Bridgeport ("Fairfield Action"), seeking a new trial on the issues already determined by the New London court. *See Pl.Exh. FF.* A copy of the summons and complaint commencing the New London Action was attached to that complaint. The Fairfield Action was stayed on September 3, 1993 when the defendant commenced this chapter 7 case, *see* 11 U.S.C. § 362(a).

#### *DISCUSSION*

As noted in *Roberti I:*

**1.** The Resolution Trust Corporation ("RTC") was appointed by the Office of Thrift Supervision, Department of the Treasury, as both the receiver and conservator of Coastal Savings Bank, FSB on June 18, 1992, *Pl.Exs. U, V* and *W*, and was the plaintiff when *Roberti I* was decided. Thereafter, the Federal Deposit Insurance Corporation ("FDIC") succeeded to the RTC's interest by operation of law pursuant to 12 U.S.C. § 1441a(m)(1). On January 10, 1996, the com-

plaint in this proceeding was amended to substitute the FDIC as the plaintiff.

**2.** The defendant claims that his first notice of the New London Action stemmed from a telephone conversation with W. Paul Kaminski, Vice–President of Coastal Savings, on or about May 6, 1992. *Roberti Testimony, 1/31/96, Tape 1 at # 2481.*

Summary judgment shall be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed. R.Civ.P. 56(c). '[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine issue of material* fact.'... While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, a party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.' The non-moving party may defeat the summary judgment motion by producing specific facts sufficient to establish that there is a genuine issue of material fact for trial. '[M]ere conclusory allegations or denials' in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.... The burden is upon the moving party to demonstrate that no genuine issue respecting any material fact exists.... That burden may be satisfied by showing that little or no evidence may be found in support of the non-moving party's case.... There is no genuine issue of material fact when no rational jury could find in favor of the non-moving party because the evidence to support its case is so slight....' Summary judgment is proper

only when reasonable minds could not differ as to the import of the evidence.' *Roberti I, supra,* 183 B.R. at 998–99 (citations omitted) (emphasis in original).

 With few exceptions, not applicable here[3], the full faith and credit doctrine, codified at 28 U.S.C. § 1738, requires a federal court to give preclusive effect to a state court judgment whenever the state in which the federal court sits would do so. *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 415–16, 66 L.Ed.2d 308 (1980). *See also Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1984); *Burka v. New York City Transit Authority,* 32 F.3d 654, 657 (2d Cir.1994); *Kelleran v. Andrijevic,* 825 F.2d 692, 694 (2d Cir.1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988); *Roberti I,* supra, 183 B.R. at 999; *Tavella v. Edwards (In re Edwards),* 172 B.R. 505, 521–522 (Bankr. D.Conn.1994). Under Connecticut law, "collateral estoppel applies to an issue that was actually litigated and necessarily determined in a prior action between the same parties on a different claim." *Roberti I,* supra at 1001; *see also Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 714, 627 A.2d 374 (1993). An issue is " 'necessarily determined' if, in the absence of a determination of the issue, the judgment could not have been validly rendered." *Id.* at 714–15, 627 A.2d 374; *Roberti I, supra* at 1001 (internal quotations and citations omitted). "Actual litigation under Connecticut law requires a 'full and fair opportunity to litigate.' " *Id.* at 1002.

 Contrary to the defendant's assertions, the entry of a default judgment for

**3.** There has been no assertion that the default judgment entered by the New London court was procured by either fraud or collusion and this court makes no such finding. Further, the New London court determined that that court had jurisdiction to issue that judgment. No credible evidence was proffered to establish that the defendant was "precluded by distance, accident or mistake from appearing." *Spartz v. Cornell (In re Cornell),* 178 B.R. 45, 49 (Bankr.D.Conn. 1995). Moreover, this court finds no exception to the full faith and credit doctrine to preclude the application of collateral estoppel in this matter since fraud and larceny are "issues well within the regular competence and experience of state courts" and "there is nothing about the

issues here sought to be precluded which suggests intervention of any strong federal bankruptcy policy prohibiting application of § 1738." *Pizza Palace, Inc. v. Stiles (In re Stiles),* 118 B.R. 81, 84–85 (Bankr.W.D.Tenn.1990). *See also Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 386, 105 S.Ct. 1327, 1334–35, 84 L.Ed.2d 274 (1984) (Specific congressional intent to create an exception to the full faith and credit doctrine must be found); *In re Cornell, supra* at 49 *quoting Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 477, 102 S.Ct. 1883, 1895, 72 L.Ed.2d 262 (1982) (internal quotations omitted) ("Congress must clearly manifest its intent to depart from § 1738 before an exception will be found").

failure to appear in the New London Action does not eliminate the application of collateral estoppel.

> Although not every default judgment should have the same preclusive effect as an actual adjudication between the present parties, in the interest of judicial economy and repose for litigants, *we envision some circumstances where it would be appropriate to give issue preclusive effect to a default judgment.* We have previously noted, after addressing the scope of issue ... preclusion, that the appropriate inquiry ... is whether the party had an *adequate opportunity to litigate the matter in the earlier proceeding* ... *State v. Ellis, supra* [197 Conn. 436,] 464–65 n. 22 [497 A.2d 974], quoting D. Currie, "Res Judicata: The Neglected Defense," 45 U.Chi. L.Rev. 317, 342 (1978). Our decision in *Ellis* indicates that *had there been a full and fair opportunity to litigate issues and such issues were necessary to a default judgment, that judgment should put to rest subsequent litigation of all issues necessary for the rendering of the default judgment.*

*Jackson, supra,* 225 Conn. at 717–718, 627 A.2d 374 (internal quotations and citations omitted) (emphasis added). *See also Roberti I, supra,* 183 B.R. at 1002; *1 Restatement (Second), Judgments § 27,* comment (e) (1982) ("It is true that it is sometimes difficult to determine whether an issue was actually litigated; even if it was not litigated, the party's reasons for not litigating in the prior action may be such that preclusion would be appropriate"). For those reasons, the conclusion in *Roberti I* that collateral estoppel could not be applied absent a determination that the defendant had actual knowledge of the pendency of the New London Action, arguably set a higher standard than necessary for the application of collateral estoppel. *Roberti I, supra,* 183 B.R. at 1003. Nonetheless, on the basis of the evidence submitted in the New London Action, it is concluded that the defendant did have actual knowledge of the pendency of that action. The question then is whether, armed with that knowledge, the defendant had a full and fair opportunity to litigate in the New London Action. For

the reasons that follow, the plaintiff has established a prima facie case on that issue.

Plaintiff's Exhibit FF is a copy of the summons and complaint that was filed in the Fairfield Action. A copy of the summons and the first page of the complaint filed in the New London Action was attached to that exhibit. The attached papers bear the late Sheriff Warren Tingley's attestation "A TRUE COPY ATTEST. WARREN TINGLEY. CHIEF DEPUTY SHERIFF. FAIRFIELD COUNTY" with his handwritten initials and prove, in the absence of a credible explanation, that the defendant had possession of those documents at some point prior to the commencement of the Fairfield Action. No other explanation was offered, and the defendant's assertion that he never had possession of those papers lacks candor.

The defendant testified that he never saw the Fairfield Action complaint, *Pl.Exh. FF,* until the trial of this matter, and that he had no knowledge that any such complaint was ever filed. *Roberti Testimony, 1/17/96, Tape 3 at # 155.* He stated further that he was uncertain how his attorneys obtained possession of the New London Action summons and complaint or how those papers came to be attached to the complaint in the Fairfield Action. *Roberti Testimony, 1/17/96, Tape 3 at # 170.* That testimony prompts the court to share in Judge Teller's expression of "grave doubts" regarding the defendant's credibility. *Memorandum of Decision, Pl. Exh.* T, 10. The question then is whether the defendant had the summons and complaint which commenced the New London Action prior to the entry of default in that action. The evidence at the hearing on the motion to open and vacate the default in the New London Action demonstrates that he did.

Even if the defendant had a residence in Florida, as he claims, *see Transcript, Hearing on Motion to Open and Vacate,* 6, 10, *Pl.Exh. S,* contrary to his assertions, he also had a residence at the Fairfield Address. The sheriff's testimony establishes that neighbors directed him to that address as the defendant's residence, and post office records listed the Fairfield Address as the residence of the defendant. *See Transcript, Hearing*

*on Motion to Open and Vacate,* 55–59, *Pl. Exh. S.* There was no forwarding address on file with the post office for the defendant. *Id.* at 39. Furthermore, the defendant's claim that he was residing in Florida and not at the Fairfield Address when Sheriff Tingley served the papers is directly contradicted by the sheriff's conversation with a boy at that address:

Mr. Cole–Chu: Okay, Would you please tell Judge Teller what happened on the occasion when you effected service on Mr. Roberti?

Sheriff Tingley: I had tried to service [*sic*] several times prior to that date, the date of the actual service. I am not in the habit of doing abode service. I try to do in hand as often as possible. I went to the house, a young boy answered the door, I asked for Mr. Roberti, *he said he wasn't there at the time,* I asked for Mrs. Roberti, he said his—both Mr. and Mrs.—*he answered both of them are out for dinner.* So I did abode service based on that information.

*Transcript, Hearing on Motion to Open and Vacate,* 50–51 (emphasis added).

The defendant did not offer any credible evidence to rebut the testimony that he was residing at the Florida Address when the papers in the New London Action were served. Indeed, the following exchange between the defendant and his attorney during the trial of this proceeding buttresses the conclusion that the defendant obtained possession of the summons and complaint in the New London Action and had actual notice of the New London Action prior to the entry of the default judgment in that action:

Mr. Burns: Is there a time when you were *served* with a lawsuit commenced by the Resolution Trust Company [*sic*] in Superior Court of the State of Connecticut?

Mr. Roberti: Yes I was.

Mr. Burns: Did you hire an attorney to defend you in that case?

Mr. Roberti: Yes I did.

*Roberti Testimony, 2/1/96, Tape 2 at 1043–1047* (emphasis added). Moreover, the de-

fendant failed to offer any evidence that he could not appear and defend the New London Action. This court "is inevitably relegated to making inferences on the ultimate issue, from basic facts which are in evidence." *United Mortgage Corporation v. Mathern (In re Mathern),* 137 B.R. 311, 319 (Bankr. D.Minn.1992). *See also In re White,* 168 B.R. 825, 829 (Bankr.D.Conn.1994) (A defendant must produce some evidence to support his assertions in order to rebut the plaintiff's prima facie case). Accordingly, it is concluded that the defendant had actual notice of the pendency of the New London Action and a full and fair opportunity to appear and defend. The analysis, however, does not end here as the plaintiff must also prove that the New London court "necessarily determined" the issues raised in this adversary proceeding under §§ 532(a)(2)(A), 523(a)(2)(B) and 523(a)(4).[4] *See Grogan v. Garner,* 498 U.S. 279, 285, 111 S.Ct. 654, 658–59, 112 L.Ed.2d 755 (1991) (". . . all creditors who have secured . . . judgments, the elements of which are the same as those of the . . . discharge exception, will be exempt from discharge under collateral estoppel principles").

### *Count One—§ 523(a)(2)(A)*

The Third Count of the plaintiff's New London Action (Fraud), pleaded substantially the same allegations as Count One of this adversary proceeding. Under Connecticut law, "[t]he essential elements of an action in fraud . . . are: (1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Miller v. Appleby,* 183 Conn. 51, 54–55, 438 A.2d 811 (1981). An action under § 523(a)(2)(A) must allege and prove:

(1) the defendant made a false representation;

(2) at the time the defendant knew the representation to be false;

4. As noted *supra* at 618–19, the mere fact that the New London court entered a default judgment for failure to appear does not eliminate the applicability of collateral estoppel. The appro-

priate inquiry is whether the defendant had an adequate opportunity to litigate issues that were necessary to a default judgment. *See Jackson, supra,* 225 Conn. at 718, 627 A.2d 374.

(3) the defendant made the representation with the intention and purpose of deceiving the creditor or inducing the creditor to act to its detriment;

(4) the creditor relied on the representation to its detriment; and

(5) the false representation was the proximate cause of the creditor's loss.

*Roberti I, supra,* 183 B.R. at 1005 (citations omitted). Under Connecticut law, a party asserting fraud must prove the requisite elements by clear and convincing evidence, *Miller, supra* at 55, 438 A.2d 811, *see also Vengoechea v. Barnett (In re Barnett),* 115 B.R. 22, 24 (Bankr.D.Conn.1990), instead of the less burdensome standard of "preponderance of the evidence" applicable to § 523(a) as mandated by *Grogan v. Garner, supra,* 498 U.S. 279, 291, 111 S.Ct. 654, 661. The different burdens of proof are not relevant here. *United States v. Rylander,* 714 F.2d 996, 1002 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984) ("It is an elementary principle of issue preclusion that it may only be asserted where the burden of proof as to [the issue in the subsequent proceeding] is no greater than it was in the prior proceeding where the issue was decided"). The fraud issue raised in Count One was therefore necessarily determined by the New London court, and since the defendant had a full and fair opportunity to appear and defend there, this court is compelled under the full faith and credit doctrine to apply collateral estoppel to bar the relitigation of the defendant's fraud.

### Count Two—§ 532(a)(2)(B)

■ A claim under § 523(a)(2)(B) requires proof by a preponderance of the evidence that a debt was obtained by the use of a statement in writing (1) that was materially false, (2) regarding the debtor's or an insider's financial condition, (3) on which the creditor reasonably relied, and (4) that the debtor caused to be made or published with the intent to deceive. 11 U.S.C. § 523(a)(2)(B). The issue of fraud relating to a financial document was not specifically pleaded and therefore not decided in the New London Action. Accordingly, collateral estoppel does not apply.

### Count Three—523(a)(4)

■ Count Three seeks a determination that the debt resulted from the defendant's larceny and is nondischargeable under § 523(a)(4). The Fifth Count of the plaintiff's complaint in the New London Action (Theft) alleges that:

... defendant stole property of the plaintiff, in that he wrongfully took or obtained money from the plaintiff with the intent to appropriate it to himself or a third person. Defendant's taking or obtaining of money from the plaintiff was wrongful in that such money was obtained by (a) false tokens of a non-existent corporation, to wit, the purported Note, Exhibit A, and Corporate Borrowing Resolution, Exhibit D; (b) by false pretenses ... with the intent to defraud the plaintiff.

*Complaint, Pl.Exh. K,* 8, ¶ 14.

■ Under § 523(a)(4), "[l]arceny is proven, for nondischargeability purposes, by a showing that the debtor has willfully taken property with fraudulent intent." *New York v. Kelly (In re Kelly),* 155 B.R. 75, 78 (Bankr. S.D.N.Y.1993). *See also State v. Sokol (In re Sokol),* 170 B.R. 556, 560 (Bankr.S.D.N.Y. 1994). Under Connecticut law:

A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. Larceny includes, but is not limited to ...

(2) Obtaining property by false pretenses. A person obtains property by false pretenses when, by any false token, pretense or device, he obtains from another any property, with intent to defraud him or any other person.

*Conn.Gen.Stats.* § 53a–119 (West 1995).

Section 523(a)(4) and Connecticut law require a showing of "fraudulent intent" in the wrongful taking of the property of another. Hence, the New London court necessarily determined that the defendant was liable on the Fifth Count and that determination satisfies the standards for larceny under § 523(a)(4). The defendant is therefore col-

laterally estopped from relitigating the larceny issue under § 523(a)(4).

### Effect of Collateral Estoppel on Statutory And Punitive Damages

■ The judgment of $817,156.16 in the New London Action, included punitive damages for fraud, treble damages for theft pursuant to *Conn.Gen.Stat.* § 52–564, and double damages[5] for forgery pursuant to *Conn. Gen.Stat.* § 52–565. The issue here is whether the statutory and punitive damages are nondischargeable under §§ 523(a)(2)(A) and 523(a)(4).[6]

The law is unsettled on the nondischargeability of punitive damages under § 523(a)(2)(A).[7] Some courts, *see, e.g., Palmer v. Levy (In re Levy)*, 951 F.2d 196 (9th Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992); *Stokes v. Vierra (In re Vierra)*, 173 B.R. 417, 418 (Bankr.N.D.Cal.1994); *Peterson v. Bozzano (In re Bozzano)*, 173 B.R. 990, 998 (Bankr. M.D.N.C.1994); *Larson v. Norris (Matter of Larson)*, 79 B.R. 462, 465 (Bankr.W.D.Mo. 1987); *McCullough v. Suter (In re Suter)*, 59 B.R. 944, 947 (Bankr.N.D.Ill.1986), have adopted the view that punitive damages under that subsection are dischargeable because § 523(a)(2)(A) excepts from discharge "any debt ... for money ... *to the extent obtained by* ... false pretenses, a false representation, or actual fraud." Therefore, only "the actual value of the money or property received by a debtor by virtue of false pretenses, a false representation or fraud" is nondischargeable. *In re Bozzano, supra,* 173 B.R. 990, 998. *See also In re Levy, supra,* 951 F.2d 196, 198; *In re Suter, supra,* 59 B.R. 944, 947 ("It is not possible under

any rational reading of the English language that two thirds of the trebling of ... actual damages in any way represents a 'debt for money ... to the extent obtained by ... actual fraud' ").

Other courts have construed § 523(a)(2)(A) more expansively and have concluded that punitive damages are excepted from discharge because the word "debt" in § 523(a)(2)(A) is broad enough to encompass noncompensatory damages or have determined that compensatory and noncompensatory damages flow from the same fraudulent conduct. *See, e.g., St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672 (11th Cir. 1993); *Sack v. Friedlander (In re Friedlander)*, 170 B.R. 472, 480 (Bankr.D.Mass.1994); *Kibler v. Winters (In re Winters)*, 159 B.R. 789, 790 (Bankr.E.D.Ky.1993); *Bender v. Tobman (In re Tobman)* 96 B.R. 429, 440 (Bankr.S.D.N.Y.1989), *rev'd on other* grounds, 107 B.R. 20 (Bankr.S.D.N.Y.1989). Those courts reason that since there is no clear legislative intent to limit the scope of nondischargeability to compensatory damages, noncompensatory damages are similarly nondischargeable.

This court is persuaded by those which except noncompensatory damages from dischargeability under § 523(a)(2)(A). In *Johnson v. Home State Bank*, 501 U.S. 78, 84, n. 5, 111 S.Ct. 2150, 2154, n. 5, 115 L.Ed.2d 66 (1991), the Supreme Court determined that " 'debt,' which is defined under the Code as 'liability on a claim,' 11 U.S.C. § 101(12) (1988 ed., Supp. III) has a meaning coextensive with that of 'claim' as defined in § 101(5)." Under that section, a "claim" is defined as a "right to payment, whether or

---

5. The plaintiff was awarded double damages for forgery in the New London Action. The plaintiff, however, does not assert a forgery count in its adversary complaint. This court therefore does not make a finding on the double damages for forgery.

6. The estoppel effect of § 523(a)(2)(B) on punitive and statutory damages is not applicable here since it was determined *supra* at 621 that no issue relating to that provision was raised in the New London Action.

7. The *Grogan* Court declined to consider whether § 523(a)(2)(A) "excepts from discharge that part

of the judgment in excess of the actual value of money or property received by a debtor by virtue of fraud," although it ultimately upheld a judgment which included actual and punitive damages under that section. *Grogan v. Garner, supra,* 498 U.S. 279, 282 n. 2, 111 S.Ct. 654, 657 n. 2. The Court further stated that "[a]rguably, fraud judgments in cases in which the *defendant did not obtain money*, property, or services from the plaintiffs and those judgments that include punitive damages awards are more appropriately governed by § 523(a)(6)." *Id* (emphasis added). Since the defendant received money as a result of his fraudulent conduct, the foregoing dicta does not impact this court's analysis.

not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). "[T]o the extent the phrase 'right to payment' is modified in the statute, the modifying language ('whether or not such right is ...') reflects Congress' broad rather than restrictive view of the class of obligations that quality as a 'claim' giving rise to a 'debt.'" *Pennsylvania Dept. of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) (construing "debt" within the meaning of § 523(a)(7)).

It is also noted that, "'[b]ut for' the act which gave rise to the nondischargeable debt, there would be no liability for [noncompensatory damages].... To discharge an ancillary debt which would not exist but for a non-dischargeable debt seems erroneous." *Freer v. Weinstein (In re Weinstein),* 173 B.R. 258, 273–275 (Bankr.E.D.N.Y.1994). *In re St. Laurent, supra,* 991 F.2d 672, 679. *See also In re Tobman, supra,* 96 B.R. at 440 (both punitive and compensatory damages flow from the same course of conduct). As the award of punitive damages is a "direct consequence" of the defendant's improper conduct, those damages should not be excepted from discharge. *See In re Weinstein, supra* at 272.

The same result is reached on policy grounds. Bankruptcy is intended to afford a "fresh start" to honest debtors. However, as the Supreme Court noted: "in the same breath that we have invoked this 'fresh start' policy, we have been careful to explain that the [Code] limits the opportunity for a completely unencumbered new beginning to the 'honest but unfortunate debtor.'" *Grogan, supra,* 498 U.S. 279, 286–287, 111 S.Ct. 654, 659. It seems unlikely that Congress "would have favored the interest in giving perpetrators of fraud a fresh start over the interest in protecting victims of fraud." *Id.* at 287, 111 S.Ct. at 659.

Contrary to the defendant's argument, a broad construction of § 523(a)(2)(A) does not thwart the fresh start objective. *See, e.g., Ellwanger v. McBroom Estate (In re Ellwanger),* 105 B.R. 551, 556 (9th Cir. BAP 1989), *overruled by Bugna v. McArthur (In re Bugna),* 33 F.3d 1054 (9th Cir.1994). As noted *supra* at 620–22, the defendant defrauded the plaintiff by conduct which was determined by the state court to justify the imposition of punitive and treble damages. Since, the defendant cannot avail himself of the fresh start policy underlying the Code on the compensatory portion of the debt, it would be incongruous to permit him to seek a safe haven under the Code for the consequences of conduct that warranted the imposition of treble and punitive damages under state law. *See In re Tobman,* 96 B.R. 429, 430 ("[W]hen a debtor has engaged in unwholesome conduct, he becomes ineligible for entitlement to the 'fresh start' desideratum"). To hold otherwise would permit the use of bankruptcy to shield a debtor from the consequences of intentional or wilful misconduct. This court will not endorse such an oxymoronic proposition. Accordingly, the award of punitive damages is nondischargeable under § 523(a)(2)(A).

Connecticut provides for treble damages for theft when property of another is stolen. *Conn.Gen.Stat.Ann.* § 52–564 (West 1995). *See Discover Leasing, Inc. v. Murphy,* 33 Conn.App. 303, 309, 635 A.2d 843 (1993) ("Statutory theft is synonymous with larceny under General Statutes § 53a–119"); *Lauder v. Peck,* 11 Conn.App. 161, 165, 526 A.2d 539 (1987) ("The word 'steals' as used in General Statutes § 52–564 is synonymous with the definition of larceny under General Statutes § 53a–119"). Several courts have found noncompensatory damages to be nondischargeable under § 523(a)(4). *See, e.g., In re Bugna, supra,* 33 F.3d 1054, 1058; *In re Levy, supra,* 951 F.2d 196, 198 (punitive damages); *Brixius v. Christian (In re Christian),* 172 B.R. 490, 500 (Bankr.D.Mass.1994) (punitive damages). "Whether for compensatory or punitive damages, a state court judgment is a 'right to payment,' and thus a 'debt' within the meaning of section 523(a)(4)." *In re Bugna, supra* at 1058. This court concurs with those courts. The imposition of treble damages as a consequence of the defendant's larcenous conduct is bolstered by the policy considerations discussed *supra* and compels a determination

that those damages are nondischargeable under § 523(a)(4).

Accordingly, IT IS ORDERED THAT the plaintiff's motion for summary judgment is granted as to § 523(a)(2)(A) and (4) and denied as to § 523(a)(2)(B); and

IT IS FURTHER ORDERED THAT the debt in the amount of $817,156.16 is nondischargeable.

## II

### ANALYSIS ON THE MERITS

#### *Statement of the Facts*

The conclusion that the entire debt is nondischargeable is also reached without reliance on collateral estoppel. Many of the salient facts in an analysis on the merits are not in dispute. The defendant was the president of an entity known as "The Roberti Group II, Inc.," which was incorporated in Delaware on August 23, 1989, *Def.Exh. 7*, and was authorized to do business in Connecticut. *Def.Exh. 8*. That corporation changed its name, on September 5, 1989 to "Westledge Real Estate II Corporation" ("Westledge"), *Pl.Exh. EE*, and was similarly authorized to conduct business in Connecticut. *Def.Exh. 9*. In August, 1989, Westledge purchased Boyer Real Estate ("Boyer"), the largest real estate business in the region. Westledge operated under a variety of names, including "Westledge Real Estate/Boyer Real Estate," "Westledge Real Estate," "Boyer Agency," "George Boyer Residential Agency," and "Westledge/Boyer Real Estate."[8]

In November 1989, the defendant approached W. Paul Kaminski, Senior Vice President of Coastal Savings and requested a line of credit for his real estate business. The following events occurred on Friday, December 1, 1989 prior to the closing of the loan on the line of credit. Kaminski recommended that the loan be approved and signed a document entitled "Processing Record"

recommending the following terms and conditions:

Line of Credit in the amount of $250,000. Rate to be at Wall Street Prime plus 1%.

1. Customer to establish Escrow Account with anticipated balances up to $500,000.

2. Coastal Savings Bank to get at least 25% of mortgage activity at Westledge/Boyer Real Estate.

3. May establish working accounts at Coastal Savings—up to $20 million in annual activity.

Purpose of Loan: Operating Capital.

*Def.Exh. 1*. The loan review committee approved the line of credit but stipulated that it was to be made to the defendant's corporation, along with a personal guarantee executed by the defendant. *Kaminski Testimony, 1/10/96, Tape 3 at # 711, 864*. Kaminski reported to the commercial loan department that the loan had been approved to a corporate borrower, but the name of that entity was not yet known. *Kaminski Testimony, 1/10/96, Tape 3 at # 2636*.

At some time prior to the closing but after the loan committee's approval, the following note was handwritten on the "Processing Record": "Use: Westledge/Boyer Realty II Corp. Suite 3–B One Bulkeley Place, New London, Connecticut 06320–6206." *Def.Exh. 1*. It is undisputed that there was no corporation by that name, *see Pl.Exh. J*. Neither the plaintiff nor the defendant was able to offer evidence to indicate the source of the incorrect corporate name nor the identity of the author of that note. The loan documents were prepared by an attorney in private practice.

On the same date but prior to the closing, Joan Weber, the Installment Loan Officer and Operations Supervisor for Coastal Savings, informed the defendant that a corporate borrowing resolution would be necessary to close the line of credit. *Weber Testimony, 1/17/96, Tape 1 at # 2659*. The defendant testified that he instructed Patricia Pastor,

---

8. Westledge filed Certificates of Adoption of Trade Name under each of those names with the Town Clerks of Stonington, Groton, Gales Ferry, Uncasville, Niantic, Old Lyme, Old Saybrook, Essex, Avon, Norwich and Madison. It appears

that certificates for the trade name "Westledge/Boyer Real Estate" were not filed in Norwich, Old Saybrook, Essex and Gales Ferry. *Def.Exh. 2*.

Chief Operating Officer of Westledge, to "handle it—to contact Harry Blake [9] and find out what needed to be done to get the bank this piece of paper." *Roberti Testimony, 1/17/96, Tape 2 at #1476.* The corporate borrowing resolution was provided to Coastal Savings by facsimile and was signed by Nora O'Shea, who certified that she was secretary and custodian of the minutes of the Board of Directors of "Westledge/Boyer Realty II Corp." ("Westledge/Boyer"). It stated further that the Board of Directors had met on December 1, 1989, and had authorized the defendant as president of Westledge/Boyer to secure a loan from Coastal Savings in the amount of $250,000.00, and to execute any necessary documentation for that purpose. *See Pl.Exh. A.* O'Shea testified that those allegations were not true. *O'Shea Testimony, 1/17/96, Tape 2 at 597.* She testified further that she did not understand what she was signing at the time she executed that document, that to her knowledge she never was an officer of the corporation, and that during her employment with the defendant she was frequently required to sign documents she did not understand. *O'Shea Testimony, 1/17/96, Tape 2 at #392–462.*[10]

At the closing, the defendant signed the revolving credit demand note ("Note"), which named the borrower as "Westledge/Boyer Realty II, Corp.," as president of the corporation and as a personal guarantor of the debt. *Pl.Exh. B.* He also signed a separate guaranty agreement, *Pl.Exh. C;* a certification of taxpayer identification number, *Pl. Exh. D;* and a borrower signature card for a commercial line of credit, *Pl.Exh. E.* According to Weber's testimony, the defendant was in a hurry to complete the closing and did not wish to have the documents explained to him. *Weber Testimony, 1/17/96, Tape 2 at #2770.* The defendant testified that he read

the name of the corporate borrower on the loan documents, but he did not point out the error because "it never dawned on [him] that the name was wrong" and he "never gave it a second thought." *Roberti Testimony, 1/31/96, Tape 2 at #247.* He stated that "unfortunately, I didn't look at it the right way, and I should have." *Roberti Testimony, 1/31/96, Tape 2 at #341.*

The $250,000.00 line of credit was substantially exhausted within two weeks.[11] On the day of the closing, the defendant prepared two checks for the purpose of drawing funds from the line of credit. *Roberti Testimony, 1/17/96, Tape 2 at #3214.* A check dated December 4, 1989, in the amount of $25,000.00 was made payable to "Westledge/Boyer." *Pl.Exh. Z.* The defendant gave that check to Pastor with directions to deposit it into the general operating account of "Westledge/Boyer," a trade name account maintained at Connecticut National Bank. *Pastor Testimony, 1/17/96, at Tape 1 at #873–886, 1180.*

The defendant disputed Pastor's testimony relating to the second check, dated November 30, 1989 (the day *before* the closing), in the amount of $155,000.00 made payable to "Westledge/Boyer Real Estate." *Pl.Ex. Y.* According to Pastor, the defendant wrote that check while she and he were sitting in his car on December 1, 1989 after the closing, and he instructed her to be sure that the check was deposited that day into his personal checking account at Sentinel Bank, the number of which he supplied. *Pastor Testimony, 1/17/96, Tape 1 at #1090.* It is undisputed that the check was personally delivered to Sentinel Bank by Kathleen Blance, Sales Manager of the Westledge office in Glastonbury, *Blance Testimony (by 4/15/94 deposition), 1/10/96, Tape 4 at #287* and deposited into his personal account; that

---

**9.** Harry Blake was a Farmington attorney who represented the defendant at the time. *Roberti Testimony, 1/31/96, Tape 1 at #285.*

**10.** The defendant offered evidence intending to show that Nora O'Shea was in fact Assistant Secretary of "Westledge Real Estate, Inc." as of November 20, 1989, *Def.Exh. 3,* and that she became Secretary of "Westledge Real Estate II Corporation" on February 21, 1990. *Def.Exh. 5; Andrews Testimony, 2/1/96, Tape 1 at #1780.*

**11.** In December, 1989 the following amounts were advanced:

| | |
|---|---|
| 12/ 5/89 | $155,000.00 |
| 12/ 7/89 | 25,000.00 |
| 12/13/89 | 5,000.00 |
| 12/14/89 | 63,000.00 |
| | $248,000.00 |

A further advance in the amount of $1,824.54 was taken on February 9, 1990. *Pl Ex I.*

those funds were then withdrawn by another check, dated December 1, 1989, made payable to "Westledge Real Estate" in the amount of $155,000.00, and redeposited in an account at Suffield Bank, *Pl.Exh. GG;* and that the "memo" space provided on the check contained the handwritten notation "Loan to Westledge."

The defendant countered with testimony that he instructed Pastor to deliver the check to the corporate department which would then "take care of it," *Roberti Testimony, 1/17/96, Tape 2 at # 2022,* and that he had no knowledge that that sum was deposited into his personal account. *Roberti Testimony, 1/31/96, Tape 1 at # 2120.* He "categorically" denied that he instructed Pastor to deposit the money into his account, *Roberti Testimony, 1/17/96, Tape 2 at # 2058,* and stated that the check which withdrew those funds from his account, *Pl.Exh. GG,* and which appears to bear his signature, was in fact written by someone else as a correcting transaction of which he was never advised. He testified that he did not discover those transactions until years later at Pastor's deposition, even though they appeared on his monthly banking statement. *Pl.Exh. II; Roberti Testimony, 1/31/96, Tape 1 at # 2135.* In support of that version of events, the defendant testified that his personal check book was kept in the office, that he did not always know its whereabouts, and that he did not know the numbers of his accounts. *Roberti Testimony, 1/31/96, Tape 2 at # 364–67.* He also stated that at least three individuals were authorized to sign his name on his personal checking account, including Nora O'Shea. *Roberti Testimony, 2/1/96, Tape 2 at # 89.* He further testified that he had seven personal checking accounts, which he did not reconcile at any time between 1987 and May, 1990. *Roberti Testimony, 2/1/96, Tape 2 at # 144–55.*

Having assessed the credibility of the witnesses, this court concludes that Pastor's testimony is more convincing. As noted *supra* at 619–20, the defendant has made statements that are not consistent with apparent facts and support a conclusion that he is not a credible witness. *See Calhoun v. Baylor,* 646 F.2d 1158, 1161 (6th Cir.1981) (Inconsistent testimony may be a basis to conclude that a witness is not credible).

## DISCUSSION

■ A creditor asserting an exception to dischargeability under § 523(a) has the burden of proving its allegations by a preponderance of the evidence. *Grogan v. Garner, supra,* 498 U.S. 279, 291, 111 S.Ct. 654, 661. *See also Bethpage Federal Credit Union v. Furio (In re Furio),* 77 F.3d 622, 624 (2d Cir.1996). Exceptions to discharge should be construed strictly and liberally in favor of the debtor. *Community Mutual Savings Bank v. Landrin (In re Landrin),* 173 B.R. 307, 310 (Bankr.S.D.N.Y.1994).

### Section 523(a)(2)(A)

Section 523(a)(2)(A) provides in relevant part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ... for money ... to the extent obtained, by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ...

11 U.S.C. § 523(a) (West 1995). In order to except its debt from discharge under that subsection, a creditor must prove that:

(1) the defendant made a false representation;

(2) at the time the defendant knew the representation to be false;

(3) the defendant made the representation with the intention and purpose of deceiving the creditor or inducing the creditor to act to its detriment;

(4) the creditor relied on the representation to its detriment; and

(5) the false representation was the proximate cause of the creditor's loss.

*Roberti I, supra,* 183 B.R. at 1005 (citations omitted).

### False Representation.

■ It is undisputed that Westledge/Boyer did not exist. *See* Certification of the Secretary of State, *Pl.Exh. J. Roberti I* concluded that the defendant made material

false representations regarding the existence of Westledge/Boyer.

I conclude that there is ample evidence to support a finding that the debtor stated that Westledge/Boyer was an existing corporation and that he was its president, and that those statements were false. The debtor admits having signed the note, guaranty, and signature card, and apparently knew of the borrowing resolution and arranged for its execution. *See* Debtor's Statement at ¶¶ 8, 9; Deposition of Vincent A. Roberti, April 29, 1994 (Debtor's Deposition), filed Nov. 7, 1994, pp. 31, 58.

*Roberti I, supra* at 1005. "Even if the [defendant] made no other representation as to the corporate status of Westledge/Boyer and his position as its officer, the existence of the signed documents is sufficient" to find that the defendant made a false representation. *Id.* As the Connecticut Supreme Court has stated:

The significance of a signature appearing on documents ... lies in the fact that a signature is the name of a person written with his own hand to signify that the writing which precedes accords with his wishes or intentions.... The signature to a writing is placed there, moreover, for the purpose of authenticating it.

*Fidelity and Casualty Co. v. Constitution National Bank,* 167 Conn. 478, 491, 356 A.2d 117 (1975) (internal quotations and citations omitted).

■ "A borrower has the duty to divulge all material facts to the lender" and "a debtor's silence regarding a material fact can constitute a false representation actionable under section 523(a)(2)(A)." *See Caspers v. Van Horne (Matter of Van Horne),* 823 F.2d 1285, 1288 (8th Cir.1987). A "material fact" is one touching upon the essence of the transaction. *Id.* The correct corporate name was an essential component to the loan transaction for the simple reason that a debt cannot be recovered from an entity which does not exist. The defendant's assertion that he read the name of the corporate borrower on the loan documents, but did not point out the error because "it never dawned on [him] that the name was wrong" and that he "never gave it a second thought," *Roberti*

*Testimony, 1/31/96, Tape 2 at # 247,* even if true, does not relieve him of his obligation to execute and deliver documents which accurately identify the corporate borrower. Further, the defendant's testimony that the loan documents were not prepared by him or anyone affiliated with him, but by employees of Coastal Savings is of no avail. *See Roberti Testimony, 1/31/96, Tape 1 at # 863, 919, 961.* To the contrary, by signing the Note as president, attesting to a taxpayer identification number, and signing a signature card, all relating to Westledge/Boyer, the defendant falsely represented that the named corporate borrower did exist and that he was its president.

**Knowledge that the representation was false and intent to deceive.**

■ There is no direct evidence that the defendant knew that there was no such corporation as Westledge/Boyer when he executed the loan documents. That lack of proof, however, is not fatal to the plaintiff's case. As observed in *Roberti I:*

Intent [to defraud] is rarely provable directly. However, a court may find that a debtor acted with a fraudulent intent after a consideration of the facts and circumstances surrounding a debtor's actions. *Hellmann v. Mask (In re Mask),* 171 B.R. 353, 356 (Bankr.E.D.Mo.1994). This court and others have held that while a debtor's mere negligence would not support a finding of actual knowledge of falsity and intent to deceive, a showing of *reckless indifference to the truth* would suffice. *Mayer v. Spanel Int'l Ltd.,* 51 F.3d 670, 675 (7th Cir.1995); [*Arm v. A. Lindsay Morrison, M.D., Inc.] (In re Arm), supra,* 175 B.R. 349, 354 (9th Cir. BAP 1994); *Fed. Trade Comm'n v. Duggan (In re Duggan),* 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994).

*Roberti I,* 183 B.R. at 1005–06 (internal quotations omitted) (emphasis added). "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *In re Duggan, supra,* 169 B.R. at 324. Intent will also be inferred if the totality of the circumstances merits such an inference. *See Ward v.*

*Wyatt (In re Wyatt),* 87 B.R. 874, 878 (Bankr.E.D.Va.1988); *Fugere v. Whitford (In re Whitford),* 95 B.R. 5, 8 (Bankr.D.R.I.1989). The fraud is evidenced by the fact that a party "affirms something to be true for which he has no basis for belief." *Jacobs v. Ballard (In re Ballard),* 26 B.R. 981, 986 (Bankr.D.Conn.1983). Moreover, if the declarant should know the truth or has the means or duty of knowing the truth, even an innocent misrepresentation may be actionable. *Richard v. A. Waldman & Sons, Inc.,* 155 Conn. 343, 346, 232 A.2d 307 (1967). If a defendant has a special means of knowledge which the plaintiff can attribute to that defendant, the "plaintiff need not show the actual knowledge of the falsity of the representation." *Miller, supra,* 183 Conn. at 56, 438 A.2d 811. *See also Omega Engineering, Inc. v. Eastman Kodak Co.,* 908 F.Supp. 1084, 1094–96 (D.Conn.1995).

The defendant either knew or had the ability to learn the correct name of the corporation for which he, as its president, sought a line of credit. His testimony that he did not know the correct name of the corporate borrower at the time he sought the line of credit, *see Roberti Testimony, 1/17/96, Tape 2 at # 2329,* is an admission that he represented himself to be the president of Westledge/Boyer "without belief in [the] truth [of that statement]." *See In re Ballard, supra.* Clearly, the president of a corporation should know its name and conversely know if it is misnamed on a document, and the defendant's assertion that he was involved with several corporate entities and that he delegated to and relied on others to do routine corporate tasks does not excuse his submission of inaccurate loan documents.

The defendant's statement that "unfortunately, I didn't look at it [the wrong name on the loan documents] the way I should have" is not only an admission of a reckless indifference to the truth but also a glaring understatement. Indeed, since he was trying to obtain a $250,000.00 corporate loan from Coastal Savings, and since he knew or should have known that the bank could not collect that debt from the corporation named in the loan documents if it did not exist, it was incumbent upon the defendant to verify that the named corporate borrower was an existing corporation.

### Reliance

▮ The defendant urges the court to find against the plaintiff on this element because Coastal Savings did not procure an attorney's opinion letter before closing the loan and did not investigate the existence of Westledge/Boyer. A duty to investigate is usually applied in the context of a reasonable person and "clearly exceeds the demand of justifiable reliance that we hold to apply under § 523(a)(2)(A)." *Field v. Mans,* —— U.S. ——, ——, 116 S.Ct. 437, 447, 133 L.Ed.2d 351 (1995) (§ 523(a)(2)(A) "requires justifiable, but not reasonable, reliance").

The circumstances here support a finding of justifiable reliance. Kaminski testified that Coastal Savings would not make a loan directly to the defendant but would provide the requested line of credit to a corporate borrower. *Kaminski Testimony, 1/10/96, Tape 3 at # 1339, 2603.* Kaminski further testified that closing documents were required at the loan closing. Each of those documents required the name of the intended corporate borrower and each stated that name as "Westledge/Boyer Realty II, Corp." The defendant signed the Note as president, and executed the remaining documents bearing the incorrect name. The plaintiff may justifiably assume that the defendant, as president of the corporate borrower, knew the name of that entity and was therefore justified in believing the materially false statement that the name of the intended corporate borrower was "Westledge/Boyer Realty II, Corp".

### Proximate Cause

▮ Kaminski testified that Coastal would not have issued the loan had it known that the entity represented as the borrower did not exist. *Kaminski Testimony, 1/10/96, Tape 1 at # 1964–84.* "Indeed, it is unimaginable that Coastal Savings would have knowingly made a loan for operating expenses to a nonexistent entity." *Roberti I,* 183 B.R. at 1007. It follows then that the defendant's material misrepresentation that the loan was for a nonexisting corporate borrower was the proximate cause of the loan.

## Section 523(a)(4)

 Section 523(a)(4) provides:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt— ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny....

11 U.S.C. § 523(a) (West 1995).

 For nondischargeability purposes, larceny is defined under federal common law as "the fraudulent and wrongful taking and carrying away the property of another with intent to convert such property to the taker's use without the consent of the owner." *Barristers Abstract Corporation v. Caulfield (In re Caulfield)*, 192 B.R. 808, 818 (Bankr. E.D.N.Y.1996) (internal quotations and citations omitted). *See also Roberti I*, 183 B.R. at 1009. The question for this court is whether the defendant had the fraudulent intent to deprive Coastal Savings of its property when he applied for the loan on behalf of his company.

The findings and conclusions reached above satisfies that condition. As noted *supra* at 626–27, the defendant induced Coastal Savings to extend a $250,000.00 line of credit by the false representation that it was lending money to an existing corporation. Further, as also noted *supra* at 627–28, he did so with fraudulent intent. Thus, Coastal Savings did not consent to extension of the line of credit.

Having concluded that the debt of $817,-156.16, *see supra,* is nondischargeable under § 523(a)(2)(A) and (4), it is not necessary to reach the issue of the dischargeability of that debt under § 523(a)(2)(B).

### ORDER

Accordingly, the debt in the amount of $817,156.16, including punitive and treble damages, *see supra* at 623, is nondischargeable pursuant to § 523(a)(2)(A) and (4) and

IT IS SO ORDERED.