In re Richard Thomas COOKE, Debtor.

Maryalice Cooke, individually and as the next friend of Richard Thomas Cooke, Jr. and Alexander Cooke, Plaintiffs,

v.

Richard Thomas Cooke, Defendant.

Bankruptcy No. 92–54150.
Adversary No. 93–05069.

United States Bankruptcy Court,
D. Connecticut.

Dec. 7, 2005.

272

Timothy D. Miltenberger, Esq., Coan, Lewendom, Gulliver & Miltenberger, New Haven, CT, for the plaintiffs.

James J. Tancredi, Esq., Day, Berry & Howard, CityPlace I, Hartford, CT, for the defendant/debtor.

## MEMORANDUM AND DECISION ON DISCHARGEABILITY OF DEBTS

ALAN H.W. SHIFF, Bankruptcy Judge.

On December 15, 1992, Richard Thomas Cooke, the defendant and debtor, commenced this chapter 11 case, which was converted on March 4, 1994 to chapter 7. On March 25, 1993, the plaintiff,[1] Maryalice Cooke, his former wife, brought the instant adversary proceeding for a determination that certain debts are nondischargeable under bankruptcy code sections 523(a)(2)(A), (a)(5) and (a)(6).

## BACKGROUND

The parties were married on September 7, 1974. In March of 1977, they moved to 1123 Sasco Hill Road in Fairfield, Connecticut ("Property"). On February 19, 1992, they entered into a "Dissolution Agreement", see Pl.Ex. A, and on May 22, 1992 their marriage was dissolved by the order of the Superior Court of the State of Connecticut at Bridgeport.

The operative pleadings are the First Amended Complaint, dated September 20, 1993, which asserted six counts under § 523, and a June 30, 2005, Substituted Answer, which included affirmative defenses.

## DISCUSSION

### Count One

■ Section 523(a)(2)(A) of the bankruptcy code excepts from discharge any debt for money obtained by false pre-

tenses, a false representation, or actual fraud.

The plaintiff alleged and the defendant admitted that on or about May 30, 1990, he executed a note ("Chase Note") in favor of Chase Manhattan Bank ("Chase"). See Amended Complaint, Count One, ¶ 6 and corresponding answer. The plaintiff alleged and the defendant also admitted that "[o]n or about February 18...in [the Dissolution Agreement]... the [defendant] agreed to indemnify the [p]laintiff ... for her liability under the Chase Note."[2] See Amended Complaint, Count One, ¶ 8 and corresponding answer. The defendant has denied that his liability to the plaintiff as a result of his obligation to indemnify her is a nondischargeable debt. See Amended Complaint, Count One, ¶ 9 and corresponding answer. The defendant, however, has admitted that "[b]y reason of the foregoing, the [d]efendant's obligation to indemnify the [plaintiff] under the Chase Note is a nondischargeable debt within the meaning of 11 U.S.C. § 523(a)(2)(a)(sic)." See Amended Complaint, Count One, ¶ 10 and corresponding answer. Read together the answers to ¶¶ 9 and 10 are irreconcilable.

The debt alleged in Count One relates to an indemnity provision in the Dissolution Agreement, see Dissolution Agreement, Art. 26, ¶ 3, but any such obligation depends upon an underlying debt owed by the plaintiff on the Chase Note. It is assumed from the cited allegations and corresponding answers that the defendant argues that there is no debt arising out of the indemnity provision, but if there is, he admits that it is nondischargeable. On that basis there is no controversy to be

1. Unless otherwise noted "plaintiff" only refers to Maryalice Cooke. "Plaintiffs" refers to all three plaintiffs.

2. In Count One, ¶ 8 of the Amended Complaint, the plaintiff incorrectly alleged that the date of the Dissolution Agreement was Febru-

ary 18, 1993. In fact it was executed on February 18, 1992. See Pl.Ex. A. Further, Count Three, ¶ 22 of the Amended Complaint incorrectly referred to the Dissolution Agreement as the "Divorce Agreement."

decided. If there is no indemnity debt, there is no dischargeability issue for the court to decide. If, on the other hand, there is an indemnity debt, the defendant has admitted that it is nondischargeable.

The court concludes, however, that it is unlikely that there will be an indemnity debt owed by the defendant to the plaintiff. During the trial the defendant admitted that he had forged the plaintiff's name on the Chase Note. *See* Tr. at 55, 94. He also admitted that he was convicted of that crime in April, 1995.[3] *See* Tr. at 190–191, 313, 396, 454.[4] It is therefore not reasonable to believe that the plaintiff might have any future liability on the forged Chase Note.

### Count Two

■ Section 523(a)(6) provides that debts "for willful and malicious injury by the debtor to ... property of another entity" are not dischargeable.

The plaintiffs alleged in Count Two that they "left a substantial portion of personal property" in the Property and the defendant "maliciously and willfully converted" that property and disposed of some or all of it without their consent and over their objection. *See* Amended Complaint, Count Two, ¶¶ 13 and 15. Even if those disputed allegations are accurate, the plaintiffs did not produce any evidence of what property was allegedly damaged or the value of any such property.

### Count Three

The gravamen of Count Three is that under the Dissolution Agreement, the plaintiff agreed to quit claim her interest in the Property to the defendant, and he agreed that upon the sale of the Property he would pay her $72,500 from the proceeds.[5] The plaintiff further alleged that she performed her part of the agreement,[6] but the defendant did not sell the Property. As a consequence, the plaintiff claims that a $72,500 debt is owed to her and that debt is not dischargeable under § 523(a)(2)(A).

■ Section 523(a)(2)(A) excepts from discharge any debt for money "to the extent it was obtained by false pretenses, a false representation, or actual fraud ...."[7] The elements of fraud under this subsection are (1) a party made a false representation, (2) the party knew the representation to be false, (3) the representation was made with the intent of deceiving or inducing another to act to his or her detriment, and (4) the other party acted in

---

3. There was no testimony or documentary evidence to identify which court convicted the defendant.

4. In view of that admission, the defendant's answer, denying that " ... the [defendant] forged the name of the Plaintiff ... on the Chase Note", is troubling. *See* Amended Complaint, Count One, ¶ 7 and corresponding answer.

5. Counts Four and Five relate to the same debt that is the subject of Count Three and therefore will not be independently considered.

6. The defendant has admitted those allegations. *See* Amended Complaint, Count Three, ¶¶ 18–19 and corresponding answers.

7. Count Three, ¶ 22 alleges that the $72,500 debt was "obtained by false pretenses and false representation". The text of § 523(a)(2)(A) includes, a third element, "actual fraud" or positive fraud. *See In re Fosco*, 14 B.R. 918, 922 (Bankr.D.Conn.1981). The common core of the three elements is an intentional misrepresentation to deceive another upon which the other party relies and is thereby injured. *See Field v. Mans*, 516 U.S. 59, 69, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (stating that the "operative terms" of § 523(a)(2)(A) are common law terms, and reliance must always be shown).

reliance upon the representation to his or her detriment. *See In re Barnett*, 115 B.R. 22, 24 (Bankr.D.Conn.1990).

■ Although the plaintiff bears the burden of proving those elements by a fair preponderance of the evidence, *see Grogan v. Garner*, 498 U.S. 279, 285–286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), a showing with psychiatric certainty of what was on the defendant's mind when he bargained for the Dissolution Agreement is not required. *See e.g., In re Leventhal*, 194 B.R. 26, 30 (Bankr.S.D.N.Y.1996) ("The statutory language of section 523(a)(2)(A)...focuses on the conduct of the debtor and the debtor's state of mind. The 'totality of the circumstances' approach is best suited to this inquiry...."); *Matter of Rickey*, 8 B.R. 860, 863 (Bankr.M.D.Fla.1981) ("One cannot x-ray the mental processes of a debtor and direct proof of intent to deceive is well-nigh impossible. However, it is not necessary to furnish direct proof and the fraudulent intent may be inferred from the surrounding circumstances.").

■ In February of 1989, the parties signed an unsecured promissory note to Chase in the amount of $100,000. *See* Tr. at 312. On May 30, 1990, Chase required the parties to enter into the Chase Note in the principal amount of $115,000 which would be secured by the Property.[8] Rather than obtain the plaintiff's signature, as he did on the original note, the defendant forged it on the Chase Note. *See* Tr. at 313. *See also, supra* at ——.

Article 11 ¶ 3 of the Dissolution Agreement provided:

Upon the sale of the [Property], the "net proceeds"... of sale shall be paid in the following order:

(a)... Capital Gains Tax ... as well as the United States Income Tax [for a property in Maine].

(b) In the event that there is a debt either attached to the property by way of lien, judgment, etc...it will be satisfied.

(c) *The [defendant] shall pay to the [plaintiff] the sum of $72,500...*

(d) The [defendant] has agreed from the proceeds of the sale to pay join debts of the parties. Said debts shall be paid...from the proceeds of the [Property] *if any sums are available* after the above designated payments have been made. (emphasis added).

The distribution scheme of ¶ 3 must be read together and on that basis it is concluded that the defendant agreed to pay the obligations in (a), (b) and (c), but he would only pay the obligations in (d) if there were any funds available. *Cf. Field v. Mans, supra* at n. 7, at 67, 116 S.Ct. 437 (discussing the negative pregnant rule of construction, whereby an express requirement in one part of a writing, i.e., (d), contrasted with silence in another part, i.e., (a)-(c), shows an intent to confine the requirement to the specified instance). Put another way, the defendant implicitly represented in Article 11, ¶ 3 that he would sell the Property and there would be sufficient equity after the sale to meet that obligation. By that representation, he fraudulently induced the plaintiff to quit claim her interest in the Property.

■ When the defendant filed his bankruptcy schedules on December 22, 1992, a mere 10 months after he entered into the Dissolution Agreement, he listed on Schedule A, that the fair market value of the Property was $856,000. That schedule also stated that there were debts secured by the Property in the aggregate

---

8. *See* Amended Complaint, Count One ¶ 6 and corresponding answer.

amount of $1,293,000.[9] *See* Pl.Ex. D, Schedule A. Regardless of the exact amount of the secured debt, there is no evidence to explain how the defendant could have reasonably believed, at the time of the execution of the Dissolution Agreement, that there was equity in the Property since Schedule A, which he signed under oath,[10] stated that the "current market value" of the Property was $437,000 below the equity line. *See* Pl.Ex. D. The conclusions are therefore inescapable that the defendant had no such belief, he implicitly made a false representation to the plaintiff, and he knew that representation was false when he made it.

Apart from whether the defendant believed there was equity in the Property when he signed the Dissolution Agreement, the predicate issue is whether he fraudulently induced the plaintiff to believe that he intended to sell the Property and pay her from the proceeds. From the following sequence of undisputed facts, it is concluded that he did.

On March 23, 1992, two months after the parties had entered into the Dissolution Agreement, the defendant filed in state court a Motion for Judicial Transfer of Real Estate to require the plaintiff to immediately quit claim her interest in the Property to him. "The title to the property must be transferred to the Defendant in order to permit the Defendant an opportunity to execute a listing agreement and *proceed to a sale....*" (emphasis added). *See* Pl.Ex. C. The plaintiff was then living in the state of Washington with her two sons, Alex and Richard. *See* Tr. at 31, 35–36. On April 14, 1992, she signed a quit claim deed. Tr. at 43. Two months after the May 22, 1992, dissolution of the marriage, the defendant married Wendy Cooke and was living in the Property with his daughter and new wife. Tr. at 320–321, 394.

The quit claim deed was recorded on August 10, 1992. *See* Pl.Ex. B. In October 1992, the defendant listed the Property for sale for $2,500,000. *See* Pl.Ex. L. As noted, two months later, on December 22nd, he stated that the fair market value of the Property was $856,000. *See* Pl.Ex. D, Schedule A. On the same date, the defendant's Statement of Intention[11] repudiated his Dissolution Agreement obligations by reporting that he would retain the Property.

On March 17, 1993, Charles Jankovsky, acting as a trustee for the RTC, filed a motion for relief from the automatic stay to foreclose a $350,000 mortgage on the Property. On July 1, 1993, the court en-

**9.** The first mortgage to Mechanics Savings Bank was executed in 1986 in the principal amount of $500,000. *See* January 8, 1993 proof of claim. The second mortgage, initially in favor of Yegen Equity Loan Corporation but later assigned to the United States Resolution Trust Corporation ("RTC"), was executed in 1988 in the principal amount of $350,000. *See* March 17, 1993 Motion for Relief from Stay. While the proof of claim and motion for relief from stay were not included in the evidence, the court takes judicial notice of these documents in the record of the case to clarify the sequence of events. *See* Rule 201, Fed. R.Evid. *See also, Rothman v. Gregor,* 220 F.3d 81, 91 (2d Cir.2000) (Taking judicial notice of complaint as public record). Finally, the Chase Note was executed in 1990 in the amount of $115,000. *See supra* at 275. When he filed his bankruptcy petition in December, 1992, the total debt on these three mortgages had increased to $585,000, $390,000, and $130,000, respectively. *See* Pl. Ex. D, Schedule A.

**10.** Bankruptcy schedules must be filed under penalty of perjury by the debtor or a bankruptcy petition preparer. *See* Official Bankruptcy Form 6; 11 U.S.C. § 110.

**11.** Section 521(a)(2) requires an individual debtor to file, under oath, a statement of intention with respect to the retention or surrender of estate property.

tered a conditional order providing a bar date of September 24, 1993. If the defendant did not confirm a plan by that date, the court would grant the RTC's motion.[12]

On July 23, 1993 and August 27, 1993, the defendant filed a Plan of Reorganization and a Second Amended Plan of Reorganization, respectively.[13] Consistent with his Statement of Intention, both of those plans reported that the defendant intended to retain the Property.[14]

The defendant filed a Third Amended Plan of Reorganization ("Plan") on September 24, 1993, which repeated his intention to retain the Property for himself. See Ct. Ex. 1 at § 11.02.[15] ("[C]onfirmation of the Plan vests all of the property of the estate in the [defendant], except as otherwise described in the Plan."). The Property was not excepted.

The untimely filing of the Plan assured that it could not be confirmed by the bar date. What is not obvious is why the defendant waited until the bar date to file the Plan, but it is not a reach to suspect that the defendant was not disappointed with the result that the RTC lien on the

Property could be foreclosed. That suspicion is reenforced by subsequent events.

The Plan was to be funded by the defendant, his stepfather, Everett Reed, and his new wife, Wendy Cooke. See Ct. Ex. 1. On November 5, 1993, Everett Reed purchased the RTC Mortgage. See Pl.Ex. I. On November 9, 1993, the defendant's former bankruptcy counsel communicated by letter to the court, with a copy to all parties in interest, that Everett Reed would no longer fund the Plan. See Pl.Ex. H. On or about August 26, 1994, Everett Reed obtained title to the Property by strict foreclosure, see Pl.Ex. E, and then "rented" it to the defendant. See Tr. at 311. However, instead of paying rent to Everett Reed, the defendant testified that he made mortgage payments directly to the lender and also paid taxes on the Property. See Tr. at 347.[16] During this entire period, the defendant continued to reside in the Property with his new wife and his daughter.

On an undisclosed date, Everett Reed transferred the Property to the Everett Reed Trust,[17] which in July 1998, trans-

---

12. The court takes judicial notice of that order to clarify the sequence of events. See supra, n. 9.

13. The court takes judicial notice of these documents as supplements to the record. See supra, n. 9.

14. See § 11.02 of the Plan of Reorganization and the Second Amend Plan of Reorganization.

15. The Third Amended Plan of Reorganization was initially offered as an exhibit by the plaintiff. The defendant objected because the plaintiff failed to list the Plan on her exhibit list, as is required by this court's pretrial order. See Second Amended Pretrial Order at ¶ 3. The plaintiff thereupon withdrew the offer. Tr. at 301–305. Later in the trial, the defendant offered the plaintiff's objection to the Plan as an exhibit. That document was

on the defendant's exhibit list. In order to view the objection in context, the court determined that the Plan would be admitted as Court's Exhibit 1, and it was entered as such without objection. Tr. at 448–449.

16. While the record does not disclose the identity of the borrower or when the mortgage was created, the defendant admitted making mortgage and tax payments directly to the lender on the Property:

 Q. The rent payment was the mortgage payment?
 A. Correct...
 Q. So the mortgage, all the costs that an owner would tend to make, right?
 A. Correct. Taxes.
 Tr. at 347.

17. The trustees of the Everett Reed Trust included the defendant's brother, stepsister and mother. See Pl.Ex. K and Tr. at 79.

ferred it to Wendy Cooke. *See* Pl.Ex. K.[18] On April 22, 2004, Wendy Cooke transferred a one-half interest in the Property to the defendant for the sum of $1.00. *See* Pl.Ex. M.

The issue of the plaintiff's reliance on the false representation in the Dissolution Agreement is the final prong of the § 523(a)(2)(A) test. The reliance need not be reasonable so long as it is justifiable. *See Field v. Mans,* 516 U.S. at 65, 74, 116 S.Ct. 437 (1995) ("No one, of course, doubts that some degree of reliance is required to satisfy the element of causation inherent in the phrase 'obtained by' ... [W]e hold that § 523(a)(2)(A) requires justifiable, but not reasonable reliance."). In *In re Fosco, supra* at n. 7, which involved similar facts as the predicate of a § 523(a)(2)(A) analysis, the court noted:

> Under bankruptcy law, it is clear that the important benefits of the fresh start belong to the honest debtor, not all debtors ... The function of section 523(a)(2)(A), both in discouraging fraud and providing relief for the victims of fraud, would be impeded by the imposition of a reasonable reliance standard. *Id.* at 922.

Further, and perhaps more to the point, the defendant, who has succeeded in deceiving the plaintiff, should not benefit from a discharge of the debt which is the product of that deception.

There can be no reasonable doubt that the plaintiff relied and was justified in relying on the implicit representation that the defendant would sell the Property and that there was sufficient equity in the Property for her to receive the $72,500. To conclude otherwise would advance the defendant's unjustified contention that she knowingly agreed to transfer her interest in the Property even though there was no assurance that it would be sold or that there would be adequate equity to pay her if it were.

The undisputed evidence that the defendant forged the plaintiff's signature on the Chase Note and, prior to that forgery, the Chase loan was not secured by the property, buttresses the plaintiff's argument that her reliance upon the plain text of Article 11, ¶ 3 of the Dissolution Agreement was justifiable. The defendant has not offered any evidence on the issue of the plaintiff's reliance. It is assumed that he recognized he is hardly in a position, in this court of equity, to challenge the quality of the plaintiff's reliance, since it was his fraudulent conduct that induced that reliance.

The court has had an opportunity to observe the parties and assess their credibility and concludes that, at the time of the execution of the Dissolution Agreement, the defendant, by false pretenses, false representations, and actual fraud, intended to get and keep control of the Property without paying the plaintiff for her interest in it. To accomplish that scheme, he wove a web of insider transactions that accommodated the path between his February 18, 1992 implicit promise to sell the Property and his December 22, 1992, Statement of Intention in which he reported his plan to retain it for himself.[19]

---

**18.** There was no documentation entered into evidence that showed how the Property was transferred from Everett Reed to the Everett Reed Trust. However, Plaintiff's Exhibit K states that the Property was transferred from the Everett Reed Trust to Wendy Cooke.

**19.** It is noted that after the plaintiff transferred her interest to the defendant on April 14, 1992, he has continuously resided in the Property and it has never left the control of a member of his family.

## Count Six

■ Section 523(a)(5) excepts from discharge debts "to a spouse . . . or child of the debtor, for alimony to, maintenance for, or support of such spouse or child in connection with a separation agreement . . . ."

Count Six alleges that, pursuant to the Dissolution Agreement, the defendant has debts encompassed by that section, including obligations for past and present education, summer camp, medical, insurance, and support of his two sons. *See* Amended Complaint, Count Six, ¶ 30. That paragraph also alleges that the defendant has debts for $72,500, past and future medical expenses, legal fees incurred in the dissolution of the marriage, and subsequent actions, alimony, obligations of indemnity, and "any other claims, debts or obligations in the Dissolution Agreement as presently existing or as modified by the [state court]."

The defendant's answer denied each of those allegations. At trial, however, the defendant admitted that any obligations under Count Six were nondischargeable. *See* Tr. at 14–15. He also repeatedly testified that there is no outstanding debt. *See* Tr. at 245, 318, 323.

The plaintiffs have not produced any evidence of any alleged debt with the single exception of the claims for indemnity and $72,500. Those allegations are the subject of Counts One and Three, respectively, and have been considered in that context.

As with Count One, there is no controversy to be decided in Count Six. If there are no outstanding debts for alimony and child support under the Dissolution Agreement, there is no dischargeability issue for the court to decide. If there are outstanding debts for alimony or child support, the

defendant has admitted that they are nondischargeable.

### Affirmative Defenses

■ The defendant asserts affirmative defenses to all six counts and to each count separately. Although he bears the burden of proof as to each affirmative defense, *see F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir.1994), he has offered no evidence to support several defenses and his allegations in others are inconsistent with the evidence adduced at trial.

*Affirmative Defenses As To All Counts:*

■ The defendant alleges that the plaintiff's claims are barred by the equitable doctrines of collateral estoppel and laches. *See* First Affirmative Defense As To All Counts. The doctrine of laches has two elements. "A party claiming this defense must establish two elements: 1) a lack of diligence by the party against whom the defense is asserted, and 2) prejudice to the party asserting the defense." *Thom v. Ashcroft*, 369 F.3d 158, 166 (2d Cir.2004).

The defendant did not offer any evidence of lack of diligence by the plaintiff. Moreover, the record of this proceeding demonstrates that the plaintiff did not unreasonably delay its commencement or prosecution. This proceeding was commenced on March 25, 1993, (the Dissolution Agreement was signed on February 18, 1992). An answer was due on or about April 26, 1993. No answer was timely filed, but on January 3, 1994, the defendant filed a motion to amend his answer. That motion was not considered because he had never filed an answer.

This proceeding was dormant for over ten years while the parties engaged in state court litigation regarding enforcement of the Dissolution Agreement. *See* Def. Ex. 2, Docket of *Maryalice Cooke v. Richard Thomas Cooke*, Case No. FA90–

0276633, Superior Court of Connecticut at Bridgeport. On June 21, 2005, after a status conference, the court ordered the defendant to file an answer on or before June 24, 2005. A "Substitute Answer" was filed on June 30, 2005.

The defendant has not offered a scintilla of evidence that he was prejudiced by any delay, even assuming that the plaintiff's lack of diligence caused the delay.

 The defendant also claims that "the plaintiff lacks standing to assert the purported claims of Richard Thomas Cooke, Jr. and Alexander Cooke." *See* Second Affirmative Defense As To All Counts. It is difficult to believe that the defendant was unaware of the relationship between his sons and the plaintiff, their mother. It is it also unlikely that he did not know that his sons were minors at the time the Dissolution Agreement was signed.[20] Armed with that information, this affirmative defense is inappropriate. Additionally, this affirmative defense is moot for the reasons stated in the discussion of Count Six.

 The Third Affirmative Defense As To All Counts is an attempt to raise abstention as an issue, "As matters of abstention, judicial deference and economy and so as to avoid inconsistent orders . . . the amount(s) alleged to due the plaintiffs, . . . are best preserved between the parties and considered and adjudicated in the state court . . . ."

 Since there is no basis for a claim that abstention is mandatory, *see* 28 U.S.C. § 1334(c)(2), the Third Affirmative Defense As To All Counts is not a viable

defense. However, except as provided in § 523(a)(3)(B), which is not applicable here, this court has discretion under 28 U.S.C. § 1334(c)(1) to abstain from hearing dischargeability proceedings under § 523(a)(2), (4)and (6). *See In re Roberti*, 183 B.R. 991, 1000 (Bankr.D.Conn.1995). This court has exclusive jurisdiction over § 523(a)(5). *See In re Edwards*, 172 B.R. 505, 523 (Bankr.D.Conn.1994).

The court declines to exercise its discretion to abstain. This dischargeability proceeding should be and will remain in this court.

*Affirmative Defenses As To Count One:*

This count relates to the dischargeability of a contingent debt for indemnity. For the reasons stated *supra*, at ———— ————, the court need not address these defenses.

*Affirmative Defenses As To Count Two:*

Count Two alleged that *personal* property belonging to the plaintiffs was "maliciously and willfully converted by the defendant after the Plaintiffs were forcefully evicted form the property." *See* Amended Complaint, Count Two, ¶¶ 13 and 15. The affirmative defense, however inexplicably relates to the transfer of real property, i.e., the Property, and alleges that " [b]y virtue of her quit claim deed to the [defendant] and the order of the Superior Court, plaintiff fails to state a claim upon which relief may be accorded." The deed at issue was a quit claim deed of real property. There is no reference in the Connecticut Superior Court orders relating to personal property. *See* Def. Ex. 1 and Pl.Ex. N.

---

**20.** Alexander Cooke testified that he was 14 years old at the time of the execution of the Dissolution Agreement. Tr. at 358. The plaintiff testified that Richard Cooke, Jr. is eight years younger than his brother. *See* Tr. at 18. A minor child may bring civil suit only

through a parent or guardian. *See Lametta v. Connecticut Light & Power Co.*, 139 Conn. 218, 220, 92 A.2d 731 (Conn.1952); *Tulin v. Tulin*, 124 Conn. 518, 522, 200 A. 819 (Conn. 1938).

*Affirmative Defenses As To Counts Three, Four, and Five:*

█ The affirmative defenses to these counts assert the equitable doctrines of collateral estoppel and res judicata in the context of a Connecticut state court decision regarding the obligations of the defendant under the Dissolution Agreement.[21] *See* Def. Ex. 1, *Maryalice Cooke v. Richard Thomas Cooke,* Case No. FA90–0276633, Memorandum of Decision Re: Motion for Modification of Judgement of Dissolution (Conn.Super.Ct. January 13, 1997).

█ As this court has observed, "collateral estoppel applies to an issue that was actually litigated and necessarily determined in a prior action between the same parties on a different claim." *In re Roberti,* 201 B.R. 614, 618 (Bankr.D.Conn. 1996). Res judicata, "contemplates that a final judgment on the merits should bar further claims by parties or their privies based on the same cause of action." *In re Raytech Corp.,* 217 B.R. 679, 685 (Bankr. D.Conn.1998). Regardless of which doctrine is applied, the same result follows because the defendant's reliance on the state court decision is misplaced. In that decision the Connecticut Superior Court wrote:

> The plaintiff offered additional evidence and testimony in an attempt to establish that the transfer of title of the [Property] located at 1123 Sasco Hill Road . . . was a *'sale' of that property* . . . The court finds that the transfer complained of by the plaintiff was part of a *discharge in bankruptcy* awarded to Richard Thomas Cooke . . . *This court takes judicial notice of that judgement and gives it full faith and credit* . . . [T]he court finds that the plaintiff has failed to establish that the transfer of the proper-

ty to Everett Reed in bankruptcy was not a bona fide, involuntary transfer of title from the parties.

Def. Ex. 1; Memorandum of Decision re: Motion for Modification of Judgement of Dissolution at 13, 17 (emphasis added).

The state court's conclusion that the transfer of the Property by foreclosure "was part of a discharge in bankruptcy" awarded to the defendant is not correct. The defendant's discharge was only a discharge of dischargeable debts. The controversy here is whether the $72,500 debt is dischargeable. Therefore, the state court judgment cannot preclude the prosecution of this adversary proceeding.

*Affirmative defenses to Count Six:*

Count Six relates to the dischargeability of debts for alimony and child support. For the reasons stated *supra,* at 279 the court need not address these defenses.

For the foregoing reasons:

JUDGMENT ON COUNTS ONE AND SIX are dismissed without prejudice for the reason that they do not raise justiciable issues. The court will retain jurisdiction to adjudicate, if appropriate, any future controversy arising from the allegations in those counts;

JUDGMENT ON COUNT TWO shall enter in favor of the defendant;

JUDGMENT ON COUNT THREE shall enter in favor of the plaintiff that the $72,500 debt is not dischargeable, and the defendant shall pay the plaintiff $72,500;

COUNTS FOUR AND FIVE are dismissed as the $72,500 debt is the subject of the Judgment on Count Three; and

IT IS SO ORDERED.

---

21. Both parties appeared *pro se* in that case.